SPERRY, Regional Director of Seventeenth Region of National Labor Relations Board, v. DENVER BLDG. & CONST. TRADES COUNCIL et al.

Civil Action No. 2407.

District Court, D. Colorado.

March 30, 1948.

322

William M. Kapell and Daniel Harrington, both of Washington, D. C., for petitioner.

Philip Hornbein, Sr., Philip Hornbein, Jr., Wayne D. Williams, and Charles T. Mahoney, all of Denver, Colo., for respondents.

SYMES, District Judge.

This case is on petition of Mr. Sperry, Regional Director of the Seventeenth Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, against the Denver Building and Construction Trades Council; United Brotherhood of Carpenters and Joiners of America, A. F. L., Local 55; International Brotherhood of Electrical Workers of America, A. F. L., Local 68; and United Association of Journeymen, Pipefitters, and apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, A. F. L., Local 3.

The petition is filed on behalf of the Board, pursuant to Section 10($l$) of the National Labor Relations Act, as amended June 23, 1947, Public Law 101, 80th Congress, Chapter 120, First Session, herein referred to as the Act, 29 U.S.C.A. § 160($l$). The application is for appropriate injunctive relief pending the final adjudication of the Board with respect to the matters pending before the Board on charges alleging that respondents have engaged in and are engaging in conduct in violation of Section 8(b), subsection 4(A), of the Act, 29 U.S.C.A. § 158(b) (4) (A).

The petition alleges that Mr. Sperry is the Regional Director of the Seventeenth Region of the Board, an agency of the United States Government, and files this petition for and on behalf of the Board; and that these labor unions who are made respondents or defendants are labor organizations within the meaning of Section 2(5) of the Act, 29 U.S.C.A. § 152(5), and are engaged in promoting and protecting the interests of their employe members within this judicial district.

It is alleged in Paragraph 4 that on January 12, 1948, Earl C. Gould and John C. Preisner, pursuant to the provisions of the Act, filed a charge with the Board, and on March 3, 1948, filed an amended charge, alleging that the respondents had engaged in and are engaged in unfair labor practices within the meaning of Section 8(b), subsection 4(A), of the Act. A copy of the amended charge is attached hereto and is an exhibit in the case.

The charges were thereafter referred to the petitioner as Regional Director of the Seventeenth Region of the Board for investigation, and the petitioner has investigated the charges and alleges that after such investigation he has reasonable cause to believe that said charges are true, and a complaint of the Board based thereon should issue against respondents.

More specifically, upon information received during the said investigation, the petitioner alleges he has reasonable cause to believe that the respondents have engaged and are engaged in conduct in violation of Section 8(b), subsection 4(A), of the Act, and affecting commerce within the meaning of Section 2, subsections (6) and (7), of the Act, as follows: That Gould and Preisner are engaged in and about Denver, Colorado, in the business of electrical contracting and the manufacturing and retailing of electrical fittings and devices. In the operation of said business during 1947 they purchased raw materials valued in excess of $50,000, approximately 90 per cent of which materials originated at points outside the State of Colorado. During the same period the value of their finished products and services exceeded $100,000, approximately seven per cent of which represented sales and/or services outside the State of Colorado.

It is alleged that William L. Doose and Luis F. Lintner, doing business as Doose and Lintner Construction Company, are engaged in Denver, Colorado, in the general building contracting business; that

one Tony Losasso, an individual doing business as Tony Losasso, contractor, is engaged in and around Denver, Colorado, as a builder and general contractor of residential structures.

Next, that on September 25, 1947, Gould and Preisner entered into arrangements with Doose and Lintner to perform certain electrical work, including the furnishing of materials, upon a certain commercial structure being erected at 1068 Bannock Street, Denver, Colorado. Pursuant to said arrangements Gould and Preisner began to perform said work on or about October 21st, 1947. In the course of their building operations at the said site, Doose and Lintner have also entered into arrangements with various other independent subcontractors to perform certain work.

That on January 8, 1948, and thereafter, the respondent Building Trades Council, through its agents, advised Doose and Lintner that if they continued to use the services of Gould and Preisner on the above-described job under construction, they would be picketed by the Building Trades Council on behalf of its constituent unions, some of whose members were engaged on that job.

Further, that on the 9th day of January, 1948, the respondent, Building Trades Council, picketed the Bannock construction site with a placard reading substantially as follows: "This job unfair to Denver Building and Construction Trades Council," because Doose and Lintner continued to use the services of Gould and Preisner and refused to submit to respondent Building Trades Council's demand that Doose and Lintner cease doing business with Gould and Preisner.

On or about January 8, 1948, respondent Building Trades Council placed Doose and Lintner, and Gould and Preisner on an "unfair list" located on the blackboard at its offices at 832 West Sixth Avenue, Denver, Colorado, and advised its constituent unions of that fact.

It is further alleged that Doose and Lintner and Gould and Preisner were placed on said unfair list because Doose and Lintner continued to use the services of Gould and Preisner and refused to submit to respondent Building Trades Council's demand that Doose and Lintner cease doing business with Gould and Preisner.

On October 23, 1947, Gould and Preisner entered into arrangements with Losasso to perform certain electrical work, including the furnishing of materials, upon residential structures on West Forty-fifth Avenue, Denver, Colorado. Pursuant to said arrangements Gould and Preisner began to perform said work on or about November 1, 1947. In the course of his building operations at said job, Losasso entered into arrangements with the various other independent sub-contractors to perform certain work.

Further, that on November 1, 1947, and again on November 7, 1947, the respondents Building Trades Council and United Brotherhood of Carpenters and Joiners of America, American Federation of Labor, Local No. 55, through their agents, induced and encouraged employe John Moller, a member of United Brotherhood of Carpenters and Joiners of America, and other employes, by orders, threats and/or promises of benefits, to leave the employ of Losasso, an object thereof being to compel Losasso to cease doing business with Gould and Preisner.

It is further alleged that on November 1, 1947, respondents Building Trades Council and United Association of Journeymen, Pipefitters and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, through their agents, induced and encouraged Michael Capra, a member of the United Association of Journeymen, Pipefitters and Apprentices, and an employe of Louis Cook Plumbing Company, an independent sub-contractor, to leave his employment at the Forty-fifth Avenue construction site because Losasso continued to use the services of Gould and Preisner and refused to submit to respondents' demand that Losasso cease to do business with Gould and Preisner.

It is then alleged that the petitioner has reasonable cause to believe and believes that the respondents, by the foregoing conduct, have in effect called, engaged in, and, by orders, threats and/or promises of bene-

fits, have induced and encouraged employes of Doose and Lintner, Losasso and employes of the various independent sub-contractors working on the Bannock Street and the Forty-fifth Avenue construction sites to engage in a strike or a concerted refusal in the course of their employment to perform services, an object thereof being to force or require Doose and Lintner, and Losasso to cease doing business with other persons, namely, Gould and Preisner, and thereby respondents have engaged in, and are engaging in unfair labor practices in violation of Section 8(b), subsection 4(A), of the Act affecting commerce, within the meaning of Section 2(6) and (7) of the Act.

That it may be fairly anticipated that respondents will continue, or repeat, their conduct hereinabove set forth, and engage in, and, by orders, threats and/or promises of benefits, induce and encourage employes to engage in strikes or concerted refusals in the course of their employment to perform services, objects thereof being to force or require Doose and Lintner, Losasso and other employers or persons to cease doing business with Gould and Preisner.

It is therefore essential and appropriate, just and proper, for the purpose of effectuating the policies of the Act, and in accordance with the provisions of Section 10(*l*) of the Act, that, pending the final adjudication of the Board with respect to these matters, respondents, and each of them, be enjoined and restrained from the commission of the acts above alleged, similar acts, or repetitions thereof, and the relief asked for is that an order to show cause be issued, which was issued by Judge Kennedy sitting here during my absence, and that the respondents be further restrained from calling, engaging in, or inducing or encouraging the employes of Doose and Lintner, Losasso, or of other employers or persons, by orders, threats, and/or promises of benefits, including an "unfair list," and picketing, or any other like acts or conduct, or by permitting any such to remain in existence or effect, to engage in a strike or a concerted refusal in the course of their employment to perform any services in order to force or require Doose and Lintner, Losasso or any other employer or per-

son to cease doing business with Gould and Preisner, and that upon return of the order to show cause, the Court is asked to issue an order enjoining and restraining respondents, and each of them, in the manner set forth above, and to grant such other and further relief as may be proper in the premises.

The matter came on for hearing yesterday and each side has argued the matter fully, and evidence has been given by the Government in support of the petition. The first question and the vital question in this case, as it appears to the Court, is raised by the respondents' motion to dismiss, on the ground that the petitioner is not entitled to the injunctive relief, for the reason that the bill does not state a cause of action under the Act, in that interstate commerce is not involved. The testimony establishes, it seems to the Court, that Gould and Preisner are a partnership engaged in doing electrical work under sub-contract on different buildings in Denver, Colorado, and they are what may be called, for the purpose of discussion, a non-union house; that is to say, they refused, and have refused consistently, to employ union members on their work, and have steadfastly employed only non-union labor, and apparently have engaged in that practice for some time until the bringing of this suit on the acts complained of brought the matter to a focus.

The question arises, naturally, and it is admitted, that if interstate commerce is not involved, then this act has no application to the situation and the facts presented here by the allegations and by the testimony of the witnesses. It is apparent that Gould and Preisner have been employed on many jobs in Denver and have steadfastly refused to employ union labor, so-called, or to compel their employes to join the union.

Now, there is evidence in behalf of the Government that on one occasion a carpenter was called off a job because Gould and Preisner were engaged in doing electrical work on the same job, and this carpenter was called off by a business agent of one of the unions, and that other similar acts have been carried out in an attempt to compel contractors to break their contracts with Gould and Preisner for the sub-con-

tracting they were doing on these jobs—that is, the electrical work

But there is no evidence at all, as I listened to it, which shows that the unions ever directly ordered anyone off the work because of the lack of union men employed by Gould and Preisner, or that they ever served any direct notice upon them that they would refuse to work unless they employed union men, although the same may be inferred from the surrounding circumstances, which indicate that is the grounds of the dispute which the labor board is here complaining of and upon which they base their application for an injunction.

All the union ever did, as far as the evidence shows, was to call one carpenter, Noller, off of the job, and it seems that a plumber who heard that Gould and Preisner was a non-union house ceased working on the job of his own volition because of non-union men being employed on that particular job.

Furthermore, on one job the unions put a picket, who conducted what is known as peaceful picketing, and there is no claim or evidence at all of any force or violence of any nature being used, and what picketing there was might be described as peaceful picketing.

The question of interstate commerce is vital to this case. It is further alleged by the Government that Gould and Preisner buy a great deal of electrical material and parts outside the State of Colorado, running up to seventy or eighty thousand dollars, and bring that material to Denver and place it in their warehouse for general use and consumption on their jobs or for sale to other people desiring such materials, but the evidence clearly establishes that this material, when it comes to Denver, is not designed or was not ordered for any particular job, and therefore when it reaches Denver and goes into their storehouse, it becomes, in my opinion, what is known as "at rest," as the term is used in the authorities; and although some of it was afterwards shipped out to adjoining states for use, most of it was used here in Denver, either by Gould and Preisner themselves on their jobs, or sold to other people desiring that type of material.

Further, that while it was in the warehouse or in the possession of Gould and Preisner, that material was processed and changed and altered to meet the requirements of the trade or their customers to whom they sold it.

Now, the authorities seem clear to me that the question of interstate commerce goes back to the Constitution of the United States, which gives Congress the power to regulate interstate commerce. U.S.Const. art. 1, § 8, cl. 3. Congress may, in a sense, define what interstate commerce is and state certain situations to which it is applicable, but Congress cannot change the original definition of that term as prescribed by the Constitution of the United States.

The contention of the Government is that while admittedly it is merely a labor dispute involved—that is, a fight between local labor unions and a local contractor, involving local jobs, over whether union or non-union labor shall be employed by the contractor on these particular jobs—the Government does not claim that the work of Gould and Preisner extends outside the jurisdiction of the Court—that is, the State of Colorado. Nevertheless, the Government contends the fact that Gould and Preisner might have been prevented from carrying on their business in Denver or might lose certain contracts due to the picketing, etc., that thereby the amount of business they do is diminished and interstate commerce is affected as a result. I cannot subscribe to this view for the reason that the Government does not contend that Gould and Preisner's business is that of importing and selling materials brought in from outside the state or shipped by Gould and Preisner outside the state. No attempt has been made by the unions to stop the use of the electrical material brought into the state by Gould and Preisner on the jobs or in any other way. It therefore would seem that any effect on interstate commerce, if there is any, is what the Supreme Court cases describe as indirect effect. In the Schechter case in the United States Supreme Court, the language of Mr. Justice Hughes appears to me to be the law applicable to this case. Justice Hughes, speaking in that case, A.L.A. Schechter

326

Poultry Corp. v. United States, 295 U.S. 495, at page 547, 55 S.Ct. 837, 850, 79 L.Ed. 1570, 97 A.L.R. 947, says this of effects on interstate commerce:

"The distinction between direct and indirect effects has been clearly recognized in the application of the Anti-Trust Act. Where a combination for conspiracy is formed, with the intent to restrain interstate commerce or to monopolize any part of it, the violation of the statute is clear. Citing cases.

"But, where that intent is absent, and the objectives are limited to intrastate activities, the fact that there may be an indirect effect upon interstate commerce does not subject the parties to the federal statute, notwithstanding its broad provisions. This principle has frequently been applied in litigation growing out of labor disputes." Citing cases.

■ Now, in the case at bar it is very clear from all the evidence that this dispute is an intrastate one. In other words, it is simply an attempt by these unions, by persuasion, to compel contractors in Denver to refuse to let sub-contracts for electrical work to Gould and Preisner for work done in Colorado only, because Gould and Preisner do not employ or sign up with the labor unions with respect to terms of work and the men that they will employ. It is purely an intrastate activity, and the mere fact that that may have an indirect effect, as Mr. Justice Hughes says, upon interstate transactions—that is, the purchase of material by Gould and Preisner from outside the State of Colorado, and its use and sale in this state—is not sufficient, in my opinion, to make it a case of interstate commerce.

And Mr. Justice Hughes continues on page 547:

"The alleged conspiracy, and the acts here complained of, spent their intended and direct force upon a local situation— for building is as essentially local as mining, manufacturing or growing crops—and if," In the case at bar this is simply a dispute over the erection of buildings in the City and County of Denver, and not elsewhere and the materials used is not involved. And he goes on: "And, if, by a resulting diminution of the commercial demand, interstate trade was curtailed either generally or in specific instances that was a fortuitous consequence so remote and indirect as plainly to cause it to fall outside the reach of the Sherman Act."

Now, true, that case was discussing the Sherman Act, 15 U.S.C.A. § 1 et seq., but nevertheless the Court there discussed and interpreted interstate commerce is interstate commerce irrespective of which particular act of Congress the Court has before it. Interstate commerce means the same thing under any set of circumstances that may arise in any litigation in the Federal Courts because, as I have said, I don't think Congress can change the basic definition of what the constitutional definition of interstate commerce is and what is not interstate commerce.

Furthermore, it would seem to me, if the contentions of the Government are sustained, that the whole distinction between interstate and intrastate commerce would be wiped out and that there would be no limit upon the power of the Federal Government to regulate the economy of the country in the most far-reaching details, something that the Courts can't lend themselves to do.

There is a large field reserved under the Constitution for what is known as interstate commerce, subject in all respects to regulation by the Federal Government. Likewise, there is reserved to the states another large field for state regulation, known as intrastate commerce, and the only cases where the Supreme Court has permitted Congress to pass acts that seemingly affect intrastate commerce is situations where intrastate commerce becomes a burden upon interstate commerce, such, for instance, as the regulation of intrastate railroad rates by the Interstate Commerce Commission, which is permitted because they interfere with interstate railroad rates fixed by the Interstate Commerce Commission. The case at bar, according to the evidence produced by the Government itself, is purely a local dispute and does not impinge upon or interfere in any way with interstate commerce.

Other examples also might be given to the same effect.

Furthermore, in this case the acts complained of have all ceased and do not exist at the present time. I am not advised what the situation is, whether Gould and Preisner are still on the black list or not, but irrespective of that, the picketing has ceased and the work on which stoppage was caused by the unions has been completed and carried out in full or there is no picketing at the present time, as I understand it.

■ Now, in reference to the blacklisting of Gould and Preisner in the offices or meeting place of the unions, it is admitted that Gould and Preisner's name was put upon a blackboard at the union headquarters where respondents hold their meetings and the labor unions and members congregate. That is a perfectly lawful act and comes within the exception, I think, of the act. Section 8(c) of the Act provides that "The expressing of any views, arguments, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of any unfair labor practice under any of the provisions of this Act, if such expression contains no threat of reprisal or force or promise of benefit."

There is no evidence of any threats or reprisals, and the mere fact that among themselves, in a private meeting place, from which the public is excluded, arguments or views or opinions are expressed by the labor leaders to the members of their union, comes clearly within the above provision of the Act.

While it is true that this act does not require the Court to pass upon the merits of the controversy, but only gives it power to grant injunctive relief in a proper case pending a hearing by the Labor Board, nevertheless, Congress has not the power to divest this Court of jurisdiction.

■ In giving the court power to grant injunctive relief it assumes that the Court shall exercise all the equity powers vested in the Federal judiciary by the Constitution. The Act requires the Court to find unfair practice, or that the plaintiff had reason to believe that there was violation of the law sufficient to justify the granting of an injunction.

The Court is of the opinion, for the reasons stated, that no question of interstate commerce is involved and, as already stated, the matter is purely one of local concern, and its effect on interstate commerce is indirect, if it affects it at all. So we do not feel that the injunctive relief asked for should be granted. Therefore, the motion to dismiss should be and is granted, and the injunction dissolved and the petition dismissed.