## SLATER v. DENVER BUILDING & CONSTRUCTION TRADES COUNCIL, et al.

### Civ. A. No. 2522.

United States District Court
D. Colorado.

Sept. 28, 1948.

Sanford B. Teu, of Washington, D. C., and James K. Sullivan, of Denver, Colo., of the National Labor Relations Board, for petitioner.

Philip Hornbein, Jr., of Hornbein & Hornbein, all of Denver, Colo., for respondents.

SYMES, District Judge.

The complaint alleges that the defendants, conspiring as an unincorporated trade council, and certain labor unions in the City and County of Denver named as defendants, are a labor organization within the meaning of Section 2(5) of the Act— I suppose that means the Taft-Hartley Act, and they are engaged in the promotion and protection of the interests of the unions and their employees within this judicial district. 29 U.S.C.A. § 152(5).

It is then alleged that Grauman Company, a Colorado corporation, filed charges with the National Labor Relations Board, alleging that respondents—that is, the unions, supra,—had been engaged in an unfair labor practice within the meaning of the Act; and the said charges were thereafter referred to petitioner, Cyrus A. Slater, Acting Regional Director of the Seventeenth Region, an officer of the National Labor Relations Board, who petitions this Court on behalf of the Board pursuant to the Act for appropriate injunctive relief pending the final adjudication of the Board with respect to the matters pending before the Board on charges of alleging that respondents are engaged in the practice, conduct and violation of the Act.

It is then alleged the charges were investigated by the petitioner and that he has reasonable cause to believe, after his investigation, the charges are true and that a complaint should issue based thereon against respondents.

The petition then sets forth certain facts. The principal one with which we are concerned here is on page 3(a). This alleges that one Grauman, a Colorado corporation, pursuant to the provisions of the Act, filed charges with the Board alleging that the respondents are engaged in unfair labor practices.

Specifically it says:

"Grauman is engaged in Colorado in the business of manufacturing, selling and sometimes in the installation of soda fountains and fixtures for stores and restaurants, and in the operation of the business in the year 1947 Grauman purchased approximately $150,000 of raw materials, of which $100,000 or 66 per cent were purchased from sources outside the State of Colorado.

"During the same period the value of the finished products manufactured and sold by Grauman was approximately $300,050, of which in excess of $100,000 or 35 per cent represents sales outside of Colorado and in foreign countries."

There were other instances of violation in respect to other purchases of soda fountains and grills changed, and other work from the Grauman Company and that other people—subcontractors, I suppose you might call them—contracted with certain people in Denver to make plumbing installations for the soda fountains and grills, and still others to do electrical work for the installation of the soda fountains and grills.

Some of the subcontractors began to perform the said work along in the latter part, or the middle of 1948.

The petition says the respondents have engaged in and by instructions, threats of reprisals and promises, have induced and encouraged employees of the Acme and employees of other firms to engage in a strike or concerted refusal in the course of their employment to handle work on any goods, works, articles, or to perform services for their employers, the object there being to force or require Quigley and other persons to cease doing business with Grauman.

Among other acts complained of is that Grauman is listed as unfair, and thereby has caused members of the union to refuse in the course of their employment to perform services for Grauman in order to re-

quire the employers to cease doing business with Grauman.

Other acts are set forth where members of the unions have been induced to engage in a concerted refusal to perform services for their employers on other jobs in order to require the subcontractors to cease doing business with Grauman. That unless these acts or conduct on the part of the labor unions are enjoined, there is likelihood that the respondents will repeat the acts, and that it is necessary for the purpose of effectuating the policies of the Act in accordance with the provisions of Section 10 thereof, that temporary injunction be issued, pending the final adjudication of the Board, enjoining and restraining respondents and each of them from the commission of the acts above alleged, or similar acts or repetition thereof.

Upon the filing of petition an order to show cause was issued and this hearing today is on this petition to show cause.

The matter has been argued and the Court is now ready to express its views thereon. This question of what is interstate commerce and what is not in a situation like this is a very close question and the Court has had this matter up in a previous case less than six months ago, entitled, Sperry, Regional Director of the Seventeenth Regional National Labor Relations Board, v. Denver Building and Construction Trades Council, decided March 30, 1948, by this Court, and reported in 77 F.Supp. at page 321.

That case is still the law. It has not been appealed and no contrary decision on a similar state of facts has been decided by any appellate court. Counsel, however, have called the Court's attention to the twelfth intermediate report of the Committee on Expenditures in the Executive Departments of Congress, being an investigation to ascertain the scope of interpretation by the General Council of the National Labor Relations Board of the term "affecting commerce" as used in the Labor Management Relations Act of 1947, 29 U.S.C.A. § 141 et seq.

It seems that hearings were held in Washington about May 26, 1948. The matter was evidently precipitated due to what was said to be extreme claims by counsel for the Relations Board as to what interstate commerce meant, and the extent of the jurisdiction of the Board.

The report says the new interpretation of commerce for the Board enlarged the meaning of that term as it has been interpreted by the National Labor Relations Board functioning under the Wagner Act and as construed by the Federal courts. It is contended by the complainants that the new interpretation of the language brings within the purview of the Act and the jurisdiction of the National Labor Relations Board practically every retail establishment and industrial plant, no matter how small or restricted in its operation.

Mr. Robert N. Denham, General Counsel for the Labor Relations Board, appeared at that hearing in answer to questions outlining the new policy of the Board. He frankly stated this, that it was about to place a new interpretation upon the term "affecting commerce" which would be a radical departure from the meaning of the term as had previously been interpreted and administered by the Board under the Wagner Act.

Nor did he deny that the new interpretation was more inclusive than the meaning which had been given the same term by the Wagner Act. He expressed the thought that the new and broader construction was necessary in order to effectuate the purposes of the Taft-Hartley Act.

Mr. Denham, when queried as to the new interpretation, testified:

"The present thought of the Board is that it is a rare case in which business does not affect commerce in some degree and that where commerce is affected the Board has jurisdiction."

After some colloquy and discussion and further proceedings this committee made certified findings which, of course, are not binding upon the Court but which are interesting as the view of the Congress which passed this Act. The findings are:

"Your subcommittee is certain that it was not the intention of Congress to include in the jurisdiction of the National Labor Relations Board every small local business which drew a small portion of its

supplies in merchandise from beyond the borders of the state or territory. Members of the subcommittee are of the opinion that any attempt on the part either of the General Counsel or the National Labor Relations Board, or the Board itself, to enlarge upon its jurisdiction by interpretation is not in keeping with the will and intent of Congress."

 Of course, their opinion is not, as I said, binding. It is not law but it is the view expressed by the members of the Committee that had charge of this bill when it was in Congress and it throws light on what Congress intended in passing this Act.

Referring back to this complaint or this petition upon which this matter is before the Court, the Court observes that while it alleges that, as already stated, Grauman buys a great deal of raw material, of which 66 per cent or $100,000 was purchased from sources outside the State of Colorado, and a smaller amount of its manufactured product, 35 per cent, represented sales outside Colorado, I presume we can assume that 35 per cent was shipped out of the State?

Mr. Teu: Yes, Your Honor.

. The Court: There is no allegation in this petition nor anywhere in this record is there any charge that this particular material which is imported from outside the State was purchased for use in manufacturing the soda fountains Grauman made and installed, and upon which all these subcontractors worked or for which they supplied material. The petition is wholly silent on that subject.

In this Wickard case, Wickard v. Filburn, in 317 U.S. 111 on page 124, 63 S.Ct. 82, 89, 87 L.Ed. 122, upon which the Government relies, it says:

" 'It follows that no form of state activity can constitutionally thwart the regulatory power granted by the commerce clause to Congress. Hence the reach of that power extends to those intrastate activities which in a substantial way interfere with or obstruct the exercise of the granted power.' "

I can't see in the case at bar it makes any difference what happened here whether or not the goods that Grauman manufactured were bought in Colorado or imported by Grauman. The result would have been the same and it wasn't necessary in the conduct of its business to buy these goods outside the State of Colorado, necessarily.

In my previous case, which is a good deal similar to this, and which I have referred to, in 77 F.Supp. 321, I stated that:

"Congress may define what interstate commerce is and state certain situations to which it is applicable, but Congress cannot change the original definition of that term as prescribed by the Federal Constitution."

I can't see that the provision in the Constitution in regard to commerce covers a situation like this. If we follow the argument of the Government here, there is nothing that Congress in its power cannot legislate on and that every transaction performed clearly within a state, and which heretofore had been denominated intrastate commerce, would be subject to Congressional regulation. I cannot subscribe to that doctrine in the absence of clearer statements by the Supreme Court or the Appellate Court to which these cases go.

The goods involved here were shipped into Colorado and came to rest as part of a general stock and were not ordered especially for any special job. If that constitutes interstate commerce, then every package of breakfast food sold by a grocer to a housewife involves interstate commerce. I am cited to no opinion that goes that far. Until they do so, I am of the same opinion as I expressed in the Slater case and must hold that your motion to dismiss must be granted, and it is so ordered and the case is dismissed.