## NATIONAL LABOR RELATIONS BOARD v. DENVER BUILDING & CONSTRUCTION TRADES COUNCIL ET AL.

No. 393.  Argued February 27, 1951.—Decided June 4, 1951.

*David P. Findling* argued the cause for petitioner. With him on the brief were *Solicitor General Perlman, Mozart G. Ratner* and *Dominick L. Manoli.*

*Wm. E. Leahy* argued the cause for respondents. With him on the brief were *Wm. J. Hughes, Jr., Louis Sherman, Martin F. O'Donoghue, Thomas X. Dunn* and *Philip Hornbein, Jr.*

*Clif Langsdale* filed a brief for the United Brotherhood of Carpenters & Joiners of America, A. F. of L., et al., as *amici curiae,* supporting respondents.

MR. JUSTICE BURTON delivered the opinion of the Court.

The principal question here is whether a labor organization committed an unfair labor practice, within the meaning of § 8 (b) (4) (A) of the National Labor Relations Act, 49 Stat. 449, 29 U. S. C. § 151, as amended by the Labor Management Relations Act, 1947,[1] by engaging in a strike, an object of which was to force the general contractor on a construction project to terminate its contract with a certain subcontractor on that project. For the reasons hereafter stated, we hold that such an unfair labor practice was committed.

In September, 1947, Doose & Lintner was the general contractor for the construction of a commercial building in Denver, Colorado. It awarded a subcontract for electrical work on the building, in an estimated amount of $2,300, to Gould & Preisner, a firm which for 20 years had employed nonunion workmen on construction work in that city. The latter's employees proved to be the only nonunion workmen on the project. Those of the general contractor and of the other subcontractors were members of unions affiliated with the respondent Denver Building and Construction Trades Council (here called the Coun-

---

[1] "SEC. 8. . . .

"(b) It shall be an unfair labor practice for a labor organization or its agents—

.        .        .        .        .

"(4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: (A) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person; . . . ." 61 Stat. 140–141, 29 U. S. C. (Supp. III) § 158 (b) (4) (A).

cil). In November a representative of one of those unions told Gould that he did not see how the job could progress with Gould's nonunion men on it. Gould insisted that they would complete the electrical work unless bodily put off. The representative replied that the situation would be difficult for both Gould & Preisner and Doose & Lintner.

January 8, 1948, the Council's Board of Business Agents instructed the Council's representative "to place a picket on the job stating that the job was unfair" to it.[2] In keeping with the Council's practice,[3] each affiliate was notified of that decision. That notice was a signal in the nature of an order to the members of the affiliated unions to leave the job and remain away until otherwise

---

[2] *Denver Building Trades Council,* 82 N. L. R. B. 1195, 1210.

[3] The Council's by-laws provided in part:

"ARTICLE I–B

"Section 1. It shall be the duty of this Council to stand for absolute *closed shop* conditions on all jobs in the City of Denver and jurisdictional surroundings. . . .    [Emphasis in original.]

"Section 2. The Board of Business Agents . . . shall have the power to declare a job unfair and remove all men from the job. They shall also have the power to place the men back on the job when satisfactory arrangements have been made.

"Section 3. Any craft refusing to leave a job which has been declared unfair or returning to the job before being ordered back by the Council or its Board of Agents shall be tried, and if found guilty, shall be fined the sum of $25.00.

"Section 4. Refusal of any organization to pay said fine shall be followed by expulsion from this Council. An organization so expelled shall pay said fine and one complete back quarter dues and per capita before being reinstated.

"ARTICLE XI–B

"Section 1. Strikes must be called by the Council or the Board of Agents in conformity with Article I–B, Sections 1–2. When strikes are called the Council shall have full jurisdiction over the same, and any contractor, who works on a struck job, or employs

ordered. Representatives of the Council and each of the respondent unions visited the project and reminded the contractor that Gould & Preisner employed nonunion workmen and said that union men could not work on the job with nonunion men. They further advised that if Gould & Preisner's men did work on the job, the Council and its affiliates would put a picket on it to notify their members that nonunion men were working on it and that the job was unfair. All parties stood their ground.

January 9, the Council posted a picket at the project carrying a placard stating "This Job Unfair to Denver Building and Construction Trades Council." [4] He was paid by the Council and his picketing continued from January 9 through January 22. During that time the only persons who reported for work were the nonunion electricians of Gould & Preisner. January 22, before Gould & Preisner had completed its subcontract, the general contractor notified it to get off the job so that Doose & Lintner could continue with the project. January 23, the Council removed its picket and shortly thereafter the union employees resumed work on the project. Gould & Preisner protested this treatment but its workmen were denied entrance to the job.

On charges filed by Gould & Preisner, the Regional Director of the National Labor Relations Board issued the complaint in this case against the Council and the

non-union men to work on a struck job, shall be declared unfair and all union men shall be called off from his work or shop.

"Section 2. The representative of the Council shall have the power to order all strikes when instructed to do so by the Council or Board of Agents. . . . All employees on a struck job shall leave the same when ordered to do so by the Council Agent and remain away from the same until such time as a settlement is made, or otherwise ordered." 82 N. L. R. B. at 1214–1215.

[4] 82 N. L. R. B. at 1211.

respondent unions.[5]   It alleged that they had engaged in a strike or had caused strike action to be taken on the project by employees of the general contractor and of other subcontractors, an object of which was to force the general contractor to cease doing business with Gould & Preisner on that project.

Between the Board's receipt of the charges and the filing of the complaint based upon them, the Regional Director of the Board petitioned the United States District Court for the District of Colorado for injunctive relief.[6]   That petition was dismissed on the jurisdictional ground that the activities complained of did not affect interstate commerce. *Sperry* v. *Denver Building Trades Council,* 77 F. Supp. 321.   Such action will be discussed later under the heading of *res judicata.*   Hearings were held by the Board's trial examiner on the merits of the complaint.   The Board adopted its examiner's findings, conclusions and recommendations, with minor additions and modifications not here material.   It attached the examiner's intermediate report to its decision and ordered respondents to cease and desist from engaging in the activities charged.   82 N. L. R. B. 1195.   Respondents petitioned the United States Court of Appeals for the District of Columbia Circuit for a review under § 10 (f).[7]   The Board answered and asked for enforcement of its order.   That court held, with one judge dissenting, that

---

[5] Originally the complaint was directed also against another union and included incidents at two other construction projects in Denver on which Gould & Preisner had subcontracted to do electrical work. The trial examiner recommended that the Board issue a cease and desist order based upon one of those incidents, but the Board dismissed the complaint as to all conduct except that on the project before us.

[6] Under § 10 (l), 61 Stat. 149–150, 29 U. S. C. (Supp. III) § 160 (l).

[7] 61 Stat. 148–149, 29 U. S. C. (Supp. III) § 160 (f).

the conduct complained of affected interstate commerce sufficiently to give the Board jurisdiction over it, but the court unanimously set aside the order of the Board and said: "Convinced that the action in the circumstances of this case is primary and not secondary we are obliged to refuse to enforce the order based on § 8 (b) (4) (A)." 87 U. S. App. D. C. 293, 304, 186 F. 2d 326, 337. The Board claimed a conflict between that conclusion and the reasoning of the Court of Appeals for the Second Circuit in No. 108, *International Brotherhood of Electrical Workers* v. *Labor Board,* 181 F. 2d 34, and of that for the Sixth Circuit in No. 85, *Labor Board* v. *Local 74, United Brotherhood of Carpenters,* 181 F. 2d 126. We granted certiorari in each case, 340 U. S. 902–903, and all were argued with No. 313, *Labor Board* v. *International Rice Milling Co., ante,* p. 665.[8] In another companion case, No. 387, *United Brotherhood of Carpenters* v. *Labor Board,* decided by the Court of Appeals for the Tenth Circuit, 184 F. 2d 60, certiorari has been denied this day, *post,* p. 947.

I. *Res Judicata.*—Respondents not only attack the jurisdiction of the Board on the ground that the actions complained of did not affect interstate commerce, but they contend that the decision rendered on that point by the District Court for the District of Colorado in *Sperry* v. *Denver Building Trades Council, supra,* has made the issue *res judicata.*[9] We do not agree. The District Court did not have before it the record on the

---

[8] For a collection and review of the Board and lower court cases dealing with these and related issues under § 8 (b) (4), see Dennis, The Boycott Under the Taft-Hartley Act, N. Y. U. Third Annual Conference on Labor (1950) 367–460.

[9] An appeal to the Court of Appeals in that proceeding was dismissed by the Board with that court's consent.

merits.  It proceeded under § 10 (1) [10] which is designed  · to assist a preliminary investigation of the charges before the filing of a complaint.  If the officer or regional attorney to whom the matter is referred has reasonable cause to believe that a charge is true and that a complaint should issue, the statute says that he shall petition an appropriate District Court for injunctive relief, pending the final adjudication of the Board.  Such proceeding is independent of that on the merits under § 10 (a)–(d).  There is a separate provision for securing injunctive relief after the filing of the complaint.  § 10 (j).  Court review is authorized in § 10 (e) and (f).  As held by the Board, 82 N. L. R. B. at 1203–1204, and the court below, 87 U. S. App. D. C. at 297, 299, 186 F. 2d at 330, 332, the very scheme of the statute accordingly contemplates that a decision on jurisdiction made in the independent preliminary proceeding for interlocutory relief,

---

[10] "(l) Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4) (A), (B), or (C) of section 8 (b), the preliminary investigation of such charge shall be made forthwith and given priority over all other cases except cases of like character in the office where it is filed or to which it is referred.  If, after such investigation, the officer or regional attorney to whom the matter may be referred has reasonable cause to believe such charge is true and that a complaint should issue, he shall, on behalf of the Board, petition any district court of the United States (including the District Court of the United States for the District of Columbia) within any district where the unfair labor practice in question has occurred, is alleged to have occurred, or wherein such person resides or transacts business, for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter.  Upon the filing of any such petition the district court shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems just and proper, notwithstanding any other provision of law: . . . ."  ·61 Stat. 149, 29 U. S. C. (Supp. III) § 160 (l).

under § 10 (1), shall not foreclose a proceeding on the merits such as is now before us.[11]

II. *Effect on Interstate Commerce.*—The activities complained of must affect interstate commerce in order to bring them within the jurisdiction of the Board.[12] The Board here found that their effect was sufficient to sustain its jurisdiction and the Court of Appeals was satisfied. We see no justification for reversing that conclusion.

The Board found that, in 1947, Gould & Preisner purchased $86,560.30 of raw materials, of which $55,745.25, or about 65%, were purchased outside of Colorado. Also, most of the merchandise it purchased in Colorado had been produced outside of that State. While Gould & Preisner performed no services outside of Colorado, it shipped $5,000 of its products outside of that State. Up to the time when its services were discontinued on the instant project, it had expended on it about $315 for labor and about $350 for materials. On a 65% basis, $225 of those materials would be from out of the State. The Board adopted its examiner's finding that any widespread

---

[11] See also, *Labor Board v. Local 74, United Brotherhood of Carpenters,* 181 F. 2d 126, aff'd in No. 85, *post,* p. 707; *Denver Building Trades Council,* 82 N. L. R. B. 93.

[12] "SEC. 10. (a) The Board is empowered . . . to prevent any person from engaging in any unfair labor practice (listed in section 8) affecting commerce. . . ." 61 Stat. 146, 29 U. S. C. (Supp. III) § 160 (a).

"SEC. 2. When used in this Act—

.        .        .        .        .

"(6) The term 'commerce' means trade, traffic, commerce, transportation, or communication among the several States . . . .

"(7) The term 'affecting commerce' means in commerce, or burdening or obstructing commerce or the free flow of commerce, or having led or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce. . . ." 61 Stat. 137–138, 29 U. S. C. (Supp. III) § 152 (6) (7).

application of the practices here charged might well result in substantially decreasing the influx of materials into Colorado from outside the State and it recognized that Gould & Preisner's annual purchase of over $55,000 of such materials was not negligible.

The Board also adopted the finding that the activities complained of had a close, intimate and substantial relation to trade, traffic and commerce among the states and that they tended to lead, and had led, to labor disputes burdening and obstructing commerce and the free flow of commerce. The fact that the instant building, after its completion, might be used only for local purposes does not alter the fact that its construction, as distinguished from its later use, affected interstate commerce.

Even when the effect of activities on interstate commerce is sufficient to enable the Board to take jurisdiction of a complaint, the Board sometimes properly declines to do so, stating that the policies of the Act would not be effectuated by its assertion of jurisdiction in that case. Here, however, the Board not only upheld the filing of the complaint but it sustained the charges made in it.

The same jurisdictional language as that now in effect appeared in the National Labor Relations Act of 1935 [13] and this Court said of it in that connection:

"Examining the Act in the light of its purpose and of the circumstances in which it must be applied we can perceive no basis for inferring any intention of Congress to make the operation of the Act depend on any particular volume of commerce affected more than that to which courts would apply the maxim *de minimis.*" *Labor Board* v. *Fainblatt,* 306 U. S. 601, 607; see also, *Labor Board* v. *Jones & Laughlin Steel Corp.,* 301 U. S. 1.

[13] 49 Stat. 450, 29 U. S. C. § 152 (6) and (7).

The maxim *de minimis non curat lex* does not require the Board to refuse to take jurisdiction of the instant case.[14]

III. *The Secondary Boycott.*—We now reach the merits. They require a study of the objectives of the strike and a determination whether the strike came within the definition of an unfair labor practice stated in § 8 (b) (4) (A).

The language of that section which is here essential is as follows:

"(b) It shall be an unfair labor practice for a labor organization . . .

.    .    .    .    .

"(4) to engage in . . . a strike . . . where an object thereof is: (A) forcing or requiring . . . any employer or other person . . . to cease

---

[14] ". . . Congress gave the Board authority to prevent practices 'tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce.' . . . Congress therefore left it to the Board to ascertain whether proscribed practices would in particular situations adversely affect commerce when judged by the full reach of the constitutional power of Congress. Whether or no practices may be deemed by Congress to affect interstate commerce is not to be determined by confining judgment to the quantitative effect of the activities immediately before the Board. Appropriate for judgment is the fact that the immediate situation is representative of many others throughout the country, the total incidence of which if left unchecked may well become far-reaching in its harm to commerce." *Polish Alliance* v. *Labor Board,* 322 U. S. 643, 648. See also, *United Brotherhood of Carpenters* v. *Sperry,* 170 F. 2d 863, 867–868.

For the current practice see Mimeograph Release of National Labor Relations Board, dated October 6, 1950, entitled "N. L. R. B. Clarifies and Defines Areas In Which It Will and Will Not Exercise Jurisdiction." See also, *Hotel Assn. of St. Louis,* 92 N. L. R. B. 1388, 27 LRR Man. 1243.

doing business with any other person; . . . ."
61 Stat. 141, 29 U. S. C. (Supp. III) § 158 (b)
(4) (A).

While § 8 (b) (4) does not expressly mention "primary"
or "secondary" disputes, strikes or boycotts, that section
often is referred to in the Act's legislative history as one
of the Act's "secondary boycott sections." The other is
§ 303, 61 Stat. 158, 29 U. S. C. (Supp. III) § 187, which
uses the same language in defining the basis for private
actions for damages caused by these proscribed activities.

Senator Taft, who was the sponsor of the bill in the
Senate and was the Chairman of the Senate Committee
on Labor and Public Welfare in charge of the bill, said,
in discussing this section:

". . . under the provisions of the Norris-LaGuardia
Act, it became impossible to stop a secondary boycott
or any other kind of a strike, no matter how unlawful
it may have been at common law. All this provision
of the bill does is to reverse the effect of the law as
to secondary boycotts. It has been set forth that
there are good secondary boycotts and bad secondary
boycotts. Our committee heard evidence for weeks
and never succeeded in having anyone tell us any
difference between different kinds of secondary boy-
cotts. So we have so broadened the provision dealing
with secondary boycotts as to make them an unfair
labor practice." 93 Cong. Rec. 4198.

The Conference Report to the House of Representatives
said:

"Under clause (A) [of § 8 (b) (4)] strikes or boy-
cotts, or attempts to induce or encourage such action,
were made unfair labor practices if the purpose was
to force an employer or other person to cease using,

selling, handling, transporting, or otherwise dealing in the products of another, or to cease doing business with any other person. Thus it was made an unfair labor practice for a union to engage in a strike against employer A for the purpose of forcing that employer to cease doing business with employer B. Similarly it would not be lawful for a union to boycott employer A because employer A uses or otherwise deals in the goods of, or does business with, employer B." H. R. Rep. No. 510, 80th Cong., 1st Sess. 43.[15]

At the same time that §§ 7 and 13 [16] safeguard collective bargaining, concerted activities and strikes between the primary parties to a labor dispute, § 8 (b) (4) restricts a labor organization and its agents in the use of economic pressure where an object of it is to force an employer or other person to boycott someone else.

A. We must first determine whether the strike in this case had a proscribed object. The conduct which the Board here condemned is readily distinguishable from that which it declined to condemn in the *Rice Milling* case, *ante*, p. 665. There the accused union sought merely to obtain its own recognition by the operator of a mill, and the union's pickets near the mill sought to influence two employees of a customer of the mill not to cross the picket line. In that case we supported the Board in its conclusion that such conduct was no more than was traditional and permissible in a primary strike. The union did not engage in a strike against the customer. It did not encourage concerted action by the customer's

---

[15] See also, Hearings before the Senate Committee on Labor and Public Welfare on S. 55 and S. J. Res. 22, 80th Cong., 1st Sess. 14, 568, 688, 983, 1614, 1814, 1838; S. Rep. No. 105, 80th Cong., 1st Sess. (Pt. 1) 3, 22, 54, (Pt. 2) 19; 93 Cong. Rec. 4844, 4845, 4858.

[16] 61 Stat. 140, 151, 29 U. S. C. (Supp. III) §§ 157, 163.

employees to force the customer to boycott the mill. It did not commit any unfair labor practice proscribed by § 8 (b) (4).

In the background of the instant case there was a long-standing labor dispute between the Council and Gould & Preisner due to the latter's practice of employing non-union workmen on construction jobs in Denver. The respondent labor organizations contend that they engaged in a primary dispute with Doose & Lintner alone, and that they sought simply to force Doose & Lintner to make the project an all-union job. If there had been no contract between Doose & Lintner and Gould & Preisner there might be substance in their contention that the dispute involved no boycott. If, for example, Doose & Lintner had been doing all the electrical work on this project through its own nonunion employees, it could have replaced them with union men and thus disposed of the dispute. However, the existence of the Gould & Preisner subcontract presented a materially different situation. The nonunion employees were employees of Gould & Preisner. The only way that respondents could attain their purpose was to force Gould & Preisner itself off the job. This, in turn, could be done only through Doose & Lintner's termination of Gould & Preisner's subcontract. The result is that the Council's strike, in order to attain its ultimate purpose, must have included among its objects that of forcing Doose & Lintner to terminate that subcontract. On that point, the Board adopted the following finding:

"That *an* object, if not the only object, of what transpired with respect to . . . Doose & Lintner was to force or require them to cease doing business with Gould & Preisner seems scarcely open to question, in view of all of the facts. And it is clear at least

as to Doose & Lintner, that that purpose was achieved." (Emphasis supplied.) 82 N. L. R. B. at 1212.[17]

We accept this crucial finding. It was an object of the strike to force the contractor to terminate Gould & Preisner's subcontract.

B. We hold also that a strike with such an object was an unfair labor practice within the meaning of § 8 (b) (4) (A).

It is not necessary to find that the *sole* object of the strike was that of forcing the contractor to terminate the subcontractor's contract. This is emphasized in the legislative history of the section.[18] See also, *Labor Board* v. *Wine, Liquor & Distillery Workers Union,* 178 F. 2d 584, 586.

We agree with the Board also in its conclusion that the fact that the contractor and subcontractor were engaged on the same construction project, and that the contractor had some supervision over the subcontractor's work, did not eliminate the status of each as an independent con-

---

[17] The Board further stated:

"2. The Trial Examiner found that the Council and the other three Respondents, by picketing Doose & Lintner's . . . project as alleged in the complaint and thereby causing members of local unions affiliated with the Council to quit work on that project, with an object of forcing Doose & Lintner to cease doing business with Gould & Preisner, engaged in strike action in violation of Section 8 (b) (4) (A). We find merit in the Respondents' exceptions only with respect to Carpenters [not involved here], and otherwise agree in substance with the Trial's Examiner's finding." 82 N. L. R. B. at 1196.

[18] Senator Taft, sponsor of the bill, stated in his supplementary analysis of it as passed: "Section 8 (b) (4), relating to illegal strikes and boycotts, was amended in conference by striking out the words 'for the purpose of' and inserting the clause 'where an object thereof is.'" 93 Cong. Rec. 6859.

tractor or make the employees of one the employees of the other. The business relationship between independent contractors is too well established in the law to be overridden without clear language doing so. The Board found that the relationship between Doose & Lintner and Gould & Preisner was one of "doing business" and we find no adequate reason for upsetting that conclusion.[19]

Finally, § 8 (c) [20] safeguarding freedom of speech has no significant application to the picket's placard in this case. Section 8 (c) does not apply to a mere signal by a labor organization to its members, or to the members of its affiliates, to engage in an unfair labor practice such as a strike proscribed by § 8 (b) (4) (A). That the placard was merely such a signal, tantamount to a direction to strike, was found by the Board.

> ". . . the issues in this case turn upon acts by labor organizations which are tantamount to directions and instructions to their members to engage in strike action. The protection afforded by Section 8 (c) of the Act to the expression of 'any views, argument or opinion' does not pertain where, as here, the issues

---

[19] See note 17, *supra*, and see also:

"What the issue really boils down to is this: Does Section 8 (b) (4) (A) apply to normal business dealings between a contractor and subcontractor, both engaged in the same general business, where boycott pressure is applied against the subcontractor in aid of a dispute with the principal contractor? Clearly it does under the wording of the statute." *Metal Polishers Union,* 86 N. L. R. B. 1243, 1252.

And see *Labor Board* v. *Wine, Liquor & Distillery Workers Union,* 178 F. 2d 584.

[20] "The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this Act, if such expression contains no threat of reprisal or force or promise of benefit." 61 Stat. 142, 29 U. S. C. (Supp. III) § 158 (c).

raised under Section 8 (b) (4) (A) turn on official directions or instructions to a union's own members." 82 N. L. R. B. at 1213.[21]

The further conclusion that § 8 (c) does not immunize action against the specific provisions of § 8 (b) (4) (A) has been announced in other cases. See No. 108, *International Brotherhood of Electrical Workers* v. *Labor Board, post,* p. 694.[22]

---

Not only are the findings of the Board conclusive with respect to questions of fact in this field when supported by substantial evidence on the record as a whole,[23] but

---

[21] "This strike action, of which the picketing was an integral and inseparable part, had the planned and expected effect of denying the services of all union workmen to Doose & Lintner while they continued to utilize the services of Gould & Preisner. Yet as soon as the illegal objective of the Respondents' strike action had been achieved, the picket, the signal to union workmen that a strike was in progress, was removed. Thereupon union workmen were again available to Doose & Lintner. Thus the joint enterprise of the Respondents was accomplished within the framework and intent of the Council's bylaws but in violation of Section 8 (b) (4) (A) of the Act." 82 N. L. R. B. at 1216. And see reference to this finding by the same trial examiner in *International Brotherhood of Electrical Workers,* 82 N. L. R. B. 1028, 1046, n. 55.

[22] "We therefore conclude that Section 8 (b) (4) (A) prohibits peaceful picketing, as well as other peaceful means of inducement and encouragement, in furtherance of an objective proscribed therein and that Section 8 (c) does not immunize such conduct." *United Brotherhood of Carpenters,* 81 N. L. R. B. 802, 815; see also, pp. 807–816; enforcement order issued in *Labor Board* v. *United Brotherhood of Carpenters,* 184 F. 2d 60, certiorari denied this day as No. 387, *post,* p. 947. See *United Brotherhood of Carpenters* v. *Sperry,* 170 F. 2d 863, 868–869; *Printing Specialties Union,* 82 N. L. R. B. 271, 290; *Bricklayers Union,* 82 N. L. R. B. 228; *Local 1796, United Brotherhood of Carpenters,* 82 N. L. R. B. 211.

[23] *Universal Camera Corp.* v. *Labor Board,* 340 U. S. 474; *Labor Board* v. *Pittsburgh Steamship Co.,* 340 U. S. 498.

the Board's interpretation of the Act and the Board's application of it in doubtful situations are entitled to weight. In the views of the Board as applied to this case we find conformity with the dual congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending · employers and others from pressures in controversies not their own.

For these reasons we conclude that the conduct of respondents constituted an unfair labor practice within the meaning of § 8 (b) (4) (A). The judgment of the Court of Appeals accordingly is reversed and the case is remanded to it for procedure not inconsistent with this opinion.

*It is so ordered.*

Mr. Justice Jackson would affirm the judgment of the Court of Appeals.

Mr. Justice Douglas, with whom Mr. Justice Reed joins, dissenting.

The employment of union and nonunion men on the same job is a basic protest in trade union history. That was the protest here. The union was not out to destroy the contractor because of his antiunion attitude. The union was not pursuing the contractor to other jobs. All the union asked was that union men not be compelled to work alongside nonunion men on the same job. As Judge Rifkind stated in an analogous case, "the union was not extending its activity to a front remote from the immediate dispute but to one intimately and indeed inextricably united to it." [1]

The picketing would undoubtedly have been legal if there had been no subcontractor involved—if the general

_____
[1] *Douds* v. *Metropolitan Federation*, 75 F. Supp. 672, 677.

contractor had put nonunion men on the job. The presence of a subcontractor does not alter one whit the realities of the situation; the protest of the union is precisely the same. In each the union was trying to protect the job on which union men were employed. If that is forbidden, the Taft-Hartley Act makes the right to strike, guaranteed by § 13, dependent on fortuitous business arrangements that have no significance so far as the evils of the secondary boycott are concerned. I would give scope to both § 8 (b) (4) and § 13 by reading the restrictions of § 8 (b) (4) to reach the case where an industrial dispute spreads from the job to another front.[2]

---

[2] See the opinion of Judge Fahy below, 87 U. S. App. D. C. 293, 186 F. 2d 326; and the dissenting opinion of Judge Clark, *International Brotherhood* v. *Labor Board,* 181 F. 2d 34, 40.