**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LOCAL 47, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, AFL, and its agents Glenn Bailey and H. Blankenship, Respondents.**

No. 15874.

United States Court of Appeals
Fifth Circuit.

June 5, 1956.

---

Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., David P. Findling, Associate Gen. Counsel, Washington, D. C., Allen P. Schoolfield, Jr., Atty., Fort Worth, Tex., Theophil C. Kammholz, Gen. Counsel, Owsley Vose, John Francis Lawless, Attys., N.L.R.B., Washington, D. C., for petitioner.

L. N. D. Wells, Jr., Mullinax & Wells, Dallas, Tex., for respondents.

Before TUTTLE, CAMERON and JONES, Circuit Judges.

CAMERON, Circuit Judge.

The National Labor Relations Board petitions for enforcement of its order entered May 24, 1955 [1] against the respondents, Local 47 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL, and Union agents Glenn Bailey and Haskell Blankenship. Upon the record made before the Trial Examiner the Board concluded that the respondents had violated the secondary boycott provisions of the National Labor Relations Act [2] in its picketing of the T. C. Bateson Construction Company and the McCann Construction Company. The sole question before us is whether there was substantial evidence to support the Board's finding that the picketing was of neutral employers and was actually aimed at forcing these employers to cease doing business with Texas Industries, Incorporated, Fort Worth Sand and Gravel Division, and J. W. Hall Construction Company.

The record discloses the following: In April, 1954, the respondent Union, Local 47, attempted to organize the teamsters in the building and construction industry in the Fort Worth, Texas, area. These efforts, directed assertedly at gaining a higher wage scale, began by the Union's seeking recognition as the exclusive bargaining agent of these truckers. Since most of the truckers in the building and construction field were employed by subcontractors, these employers, including

---

1. 12 N.L.R.B. No. 111.

2. 29 U.S.C.A. § 158(b) (4) (A):
"It shall be an unfair labor practice for a labor organization or its agents — * * *
"(4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: (A) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person."

the Fort Worth Sand and Gravel Company, were first contacted. However, the Union's efforts along this line proved unsuccessful.[3] Thereupon, in May, 1954, the Union hired an "Assistant Business Agent", Haskell Blankenship, whose job was to obtain the benefits sought for drivers in the building and construction field. Because efforts through the subcontractors and their drivers directly had proven unsuccessful, it was decided that better results would be obtained by attempting to negotiate with the general contractors.

To this end, a meeting was sought with the Labor Relations Committee of the Fort Worth Chapter of the Associated General Contractors. This association declined to meet with the Union on the ground that none of its members employed truck drivers or teamsters. Nevertheless, it was decided by respondents that the individual contractors should be contacted for the purpose of persuading them to sign form contracts which contained clauses relating to drivers' wages, hours and working conditions; and which also contained a "subcontractor clause" providing that "any subcontractor engaged to perform work covered by this agreement for employer shall assume all terms and conditions of this agreement."

One of the proposed contracts was promptly presented to Robert Spears, a superintendent for the T. C. Bateson Construction Company. At that time Bateson had a contract for the construction of a hangar at Carswell Air Force Base at Fort Worth, and it was in connection with this project that a portion of the controversy arose. Bateson had given a subcontract to Fort Worth Sand and Gravel Company to supply the concrete ("ready-mix" and "dry batch") for this job, while, to the J. W. Hall Construction Company, was subcontracted the job of furnishing of labor and materials for laying the concrete floor of the hangar. Spears was agreeable to the contract except for the "subcontractor clause", and, therefore, the contract was not signed at that time. At the suggestion of Spears who said he had no authority to sign such a contract, Blankenship contacted T. C. Bateson, President of the construction company.

There is a conflict with regard to what was said at this time; however, Mr. Bateson testified that Blankenship told him that he wanted Bateson's assistance in the Union's efforts to organize the drivers for Fort Worth Sand and Gravel Co., and unless Bateson gave such assistance it would be necessary to picket the Carswell project. Mr. Bateson was also told that the Union had drivers who could do the hauling jobs instead of the non-union drivers employed by Fort Worth Sand and Gravel Company. Mr. Bateson referred the Union representative back to Spears, but said his company had been in the habit of using union help whenever possible, and would lend its assistance in trying to avoid a picketing of the job.

The following day, according to Spears, Blankenship approached him with the suggestion that Bateson buy its concrete from another supplier inasmuch as Fort Worth Sand and Gravel Company was "unfair". He told Spears that the Union was then picketing Fort Worth Sand and Gravel Company but were not getting any benefit therefrom and, in order to derive some benefit, it would be necessary to picket the Carswell project too. After another conversation with Mr. Bateson, following generally the line of the conversation had with him on July 2nd, Blankenship and Bailey returned to Spears on July 7th and repeated the proposition that a supplier favorable to the Union be substituted for Fort Worth Sand and Gravel Company. At this time Spears informed Blankenship that Hall Construction Company had a subcontract to pour the floor of

3. e. g., Upon petition of the Union, the N. L. R. B. in June, 1954 conducted an election among the "ready-mix" drivers employed by Texas Industries, Inc., Fort Worth Sand and Gravel Division, but this election resulted in a vote against the Union.

the hangar, but he thought Hall used union drivers. James Hess, Superintendent for Hall, was present at this meeting and through him Blankenship learned that Hall's supplier for the Carswell project was "non-union". As a result, Bailey warned Hess that, unless union drivers were given the job of hauling supplies for Hall, the whole Carswell project would be picketed. A picketing of Bateson's job at Carswell was begun on July 9th, with signs reading, "T. C. Bateson Construction Company Unfair To Local 47."

Spears testified that, on the day the picket appeared, he asked Blankenship "What it would take to get the picket line off", and offered to replace Bateson's one part-time truck driver with a union man. The Union representative, however, indicated that he was not interested in this driver, but wanted the whole job to be handled by union men. A state court granted a temporary restraining order and the picket was removed until July 13th, when this restraining order was dissolved, the state court determining that it had no jurisdiction of the matter. At an unsuccessful meeting with S. N. Thompson, Bateson's chief engineer, on July 13th, the Union representative characterized Hall Construction Company as a "rat contractor". A final effort to settle was made through the Fort Worth Building Trades Council, but this organization voted to allow the picketing to continue pending further negotiations. Thereafter, on July 23rd, Bateson signed a modified contract submitted by the Union containing the "subcontractor clause."

On August 4th Blankenship, armed with a contract similar to the one first presented to Bateson, approached L. W. Boyd, a building superintendent for McCann Construction Company at its Paschal High School Construction job. McCann was general contractor for this project. Boyd testified that he told Blankenship there should be no difficulty in gaining recognition for the Union on the job since McCann employed only one part-time truck driver. When Blanken-

ship advised him that the situation was "more involved" since McCann was using subcontractors, including Fort Worth Sand and Gravel Company, whose drivers were not organized, Boyd referred him to the company president, T. A. McCann. Mr. McCann testified that he was a "union contractor" using union help whenever possible. At a meeting on August 6th attended by McCann, Leon Stanley, General Manager of McCann Construction Company, and Blankenship, McCann agreed that the Union could organize anybody working on his project, but stated that he did not employ any teamsters. To this, Blankenship replied that the contracts with the general contractors were being sought in an effort to reach the subcontractors who used non-union teamsters. Blankenship especially mentioned Joe Starks to whom had been sublet the excavating job at the Paschal School but who was not paying his drivers the union scale.

McCann refused to sign the contract containing the "sub-contractor clause" explaining that to do so would alter the contracts previously entered into with the various subcontractors. Stanley testified that he also explained at length the company's position with regard to the contract containing the subcontractor clause, and then asked Blankenship, "Just who are you mad at?" To this Blankenship replied: "We are mad at Fort Worth Sand and Gravel, Joe Starks and anybody else who employs teamsters but refuses to execute a contract with our Local." Finally Blankenship warned that, if the contract was not signed, a strike of members of the Fort Worth Building Trade Union Council on the Paschal School project would be called and the job picketed. When McCann Construction Company, through Stanley, again refused to sign the contract, a strike was called and the job was picketed from August 9th until August 24th, during which time work on the Paschal School project came to a standstill. The picket signs on the job read: "T. A. McCann Construction Company Unfair To Teamsters Local 47."

The General Counsel's witnesses, Bateson and McCann, testified positively that the various subcontractors were independent and their employees were not employees of the general contractors and were not hired or fired by them. Based upon this and other credible evidence the Board found that the general contractors involved herein reserved no right of control nor did they control the methods of operations of the subcontractors.

Upon a review of this and other similar evidence heard by the Trial Examiner, both he and the Board found that the Union had no "primary dispute" with Bateson and McCann as general contractors, and that they were picketed as "secondary employers"; that the Union's immediate object was to raise the wage scale of drivers employed by subcontractors; but that, in demanding a contract with the general contractors containing the "subcontractor clause", the Union, in effect, sought to prevent these general contractors from doing business with such subcontractors who might refuse to honor the terms of that contract. The Board expressed its decision thus: "To that extent, at least, it is clear that it was an object of the Union in picketing Bateson and McCann to force them to cease doing business with Texas and Hall. Accordingly, we find that the Union's object falls within the proscription of Section 8(b) (4) (A)."

The Board ordered, among other things, that the Union and its officers and agents cease such activities and that a notice be posted in the Union's business office signed by designated agents, stating that the Union would not encourage employees of McCann or Bateson to strike for the purpose of requiring these employers to cease doing business with Texas Industries or Hall Construction Company.

■ We think that the findings of the Trial Examiner, insofar as adopted by the Board in its order, are amply supported by substantial evidence in the record to show that the object of the Union's picketing of Bateson and Mc-

Cann was within the scope of those activities prohibited by Section 8(b) (4) (A) of the National Labor Relations Act.

■ The intent and purpose of Section 8(b) (4) (A) is set forth in N. L. R. B. v. Denver Building & Construction Trades Council, 1951, 341 U.S. 675, 686, 71 S.Ct. 943, 950, 95 L.Ed. 1284, in the Supreme Court's quotation from the Conference Report to the House of Representatives with regard to this section:

" 'Under clause (A) [of Section 8 (b) (4)] strikes or boycotts, or attempts to induce or encourage such action, were made unfair labor practices if the purpose was to force an employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of another, or to cease doing business with any other person. Thus it was made an unfair labor practice for a union to engage in a strike against employer A for the purpose of forcing that employer to cease doing business with employer B. Similarly it would not be lawful for a union to boycott employer A because employer A uses or otherwise deals in the goods of, or does business with employer B.' "

And, in the same case, the Supreme Court stated, 341 U.S. at page 689, 71 S.Ct. at page 952: "It is not necessary to find that the *sole* object of the strike was that of forcing the contractor to terminate the subcontractor's contract."

The Board had sufficient evidence before it to justify a finding that the Union's activities in this case were directed not at Bateson and McCann, but at certain of the subcontractors. Clearly the purpose was to force subcontractors to abide by terms of contracts with the general contractors. If the subcontractors refused to abide by these terms, the general contractor was forced either to provide directly the increased wages for the subcontractors' drivers or to cease doing business with the subcontractors. These objectives and the direct effects of the Union's efforts in this respect ren-

der the Union's picketing of the general contractors violative of the "secondary boycott" provisions of the Act.

The order will, therefore, be

Enforced.