**NATIONAL LABOR RELATIONS BOARD
v. LLOYD A. FRY ROOFING
CO. et al.
No. 12775.**

United States Court of Appeals,
Ninth Circuit.

Nov. 30, 1951.

made following proceedings had before it under Section 10 of the Labor Management Relations Act,[1] as amended.

There are several respondents. Volney Felt Mills Inc. is a subsidiary of Lloyd A. Fry Roofing Company. St. Johns Motor Express Company is engaged, among other enterprises, in installing industrial machinery. Building and Construction Trades Council of Portland and Vicinity, AFL, and Millwrights and Machine Erectors Union, Local No. 1857, United Brotherhood of Carpenters and Joiners of America, AFL, are labor organizations within the meaning of Section 2(5) of the Act.[2] These respondents are referred to herein as Volney, Fry, St. Johns, Council and Millwrights, respectively. International Association of Machinists is referred to as Machinists and its affiliate Willamette Lodge No. 63 is referred to as Lodge No. 63.

Fry is in the business of manufacturing, distributing and selling asphalt roofing, and Volney is the manufacturer of the felt or coarse paper base for the roofing. The claimed unfair labor practices occurred at Portland, Oregon, at which place Fry has had for some time a roofing plant. In 1947 Volney undertook the construction of a plant adjacent to the Fry operations. Prior to the completion of the felt plant, all of Fry's felt requirements were acquired from sources outside the State of Oregon. Subsequent to the completion, those requirements were produced in the Portland felt plant. The contract for the construction of the building was let by Fry to Campbell, Lowrie, Lautermilch Corporation of Chicago, herein referred to as the Building Contractor. Subsequently, Fry entered into a contract with St. Johns for the installation by St. Johns, on a cost plus basis, of the machinery for the mill, under which Fry reserved "complete supervision [and] control" over the installation.

The Building Contractor and the Council had a closed shop contract dated February 21, 1947, which antedated the construction of the building. During the negotiations leading up to the execution thereof, Coun-

George J. Bott, Gen. Counsel, National Labor Relations Board, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Owsley Vose and Melvin Pollack, Attys., National Labor Relations Board, Washington, D. C., for petitioner.

Barzee, Leedy & Keane and Hugh L. Barzee, Portland, Or., for respondents Lloyd A. Fry Roofing Co. and others.

Green, Landye & Richardson, Burl L. Green, J. Robert Patterson and Donald S. Richardson, Portland, Or., for respondents Building & Construction Trades Council and others.

Before HEALY and ORR, Circuit Judges, and LEMMON, District Judge.

LEMMON, District Judge.

The National Labor Relations Board petitions for an enforcement of its order

---

1. 29 U.S.C.A. § 160.

2. 29 U.S.C.A. §§ 141, et seq., 152(5).

cil's representative stated to R. R. Lautermilch, president of Building Contractor, that the agreement would not meet with Council's approval unless assurances were given by Fry that the installation of the machinery would be done under A. F. of L. jurisdiction. Later Lautermilch wrote the Council that "all work on the new building, be it construction, pipe work or setting of machinery" would be done by union labor under that jurisdiction. But he added in the same letter that he could not state that the "machinery setting will come under our contract, but I have been assured by the owner the work will be done on a fair basis to you." The manager of St. Johns and Fry's Portland manager were both instructed by the chief engineer for Volney to employ Machinist Union No. 63 A. F. of L. labor in setting the machinery. Shortly before the installation work was started, St. Johns phoned Lodge No. 63, which at the time had offices in the A. F. of L. Labor Temple, though it had withdrawn from A. F. of L. some time previously, for the men necessary to do the work. Machinists were dispatched by Lodge No. 63 for that purpose. After these men had been a few days on the job the secretary of Council contacted St. Johns and threatened economic sanctions against Fry, Volney and St. Johns, and work stoppage, unless these machinists were discharged and millwrights from Council employed in their place. Acting under instructions from Fry and Volney, St. Johns discharged the machinists and they were replaced by men sent by Council.

■ It is conceded that the closed shop contract of February 21, 1947, is valid, since it was entered into prior to the effective date of the Taft-Hartley Act.[3] Respondents contend that Lautermilch was acting as the agent of Fry and Volney, that the letter written by him to Council would have bound the building contractor had it done the setting of the machinery, and that, assuming authority of Lautermilch to bind

Fry and Volney was lacking, the contract was ratified by them.

■ We agree with the Board in its decision and order. The contract between Council and Building Contractor was not signed by Fry or Volney. The letter does not purport to bind Fry or Volney. The statements therein are not evidence of agency and there is an absence of authority to make the statements on their behalf. Lautermilch did not testify that he was authorized by either Fry or Volney to write it. He had no recollection as to why he wrote the letter other than, as he testified, "that it was with the idea of keeping the job organized". There is no evidence that anyone with authority authorized the writing of the letter, or knew before the controversy arose that it had been written, or had authorized Lautermilch to commit either Fry or Volney in any particular in the machinery installation. Therefore, it can not be said that when they decided to employ A. F. of L. labor to do the installing they were thereby ratifying an agreement not previously authorized. They knew of no commitment on their behalf and there could be no intent to ratify any commitment not known to them. The most that can be gathered from the evidence is that Lautermilch agreed that he would employ A. F. of L. labor if his firm obtained the installing contract, that Fry and Volney without knowledge of the letter but with the intention of employing A. F. of L. labor, though under no obligation to do so, requested Lodge No. 63 to supply the needed workmen, under the mistaken belief that Lodge No. 63 was affiliated with A. F. of L. This falls far short of ratification of an unauthorized transaction since there are lacking two essentials, 1, knowledge of the facts relating to the unauthorized act of the one who assumed to act as agent, and 2, intention on the part of the principal to ratify the unauthorized act.

■ Respondents' briefs, apparently written before recent decisions of the Su-

---

3. Colgate-Palmolive-Peet Co. v. N. L. R. B., 338 U.S. 355, 70 S.Ct. 166, 94 L.Ed. 161.

preme Court, argue that the claimed unfair labor practices do not sufficiently affect interstate commerce to bring them within the jurisdiction of the Board. They have apparently abandoned this position, or at least on the oral argument did not seriously advance it. Without detailing the extent of the interstate operations of Fry and St. Johns, it was shown to be of substantial volume, sufficient to bring the practices well within the Board's jurisdiction.[4]

■ Fry and Volney feel aggrieved that the Board's order is directed against them, because the acts complained of and attributed to them were done by them under coercion of the Council; that their action was under economic duress. As we have heretofore held, this affords them no defense.[5]

Lastly, respondents claim that had the threatened stoppage of work taken place, there would have been a continuance in greater volume rather than an interruptance in the flow of felt in interstate commerce, since prior to the completion of the Volney plant, Fry obtained all of its felt requirements outside the State of Oregon. The ready answer to this is that the construction of the building and the installation of the machinery would have been affected if the threats of the Council had been carried out. As the Supreme Court stated in the Denver case,[6] "The fact that the instant building, after its completion, might be used only for local purposes does not alter the fact that its construction, as distinguished from its later use, affected interstate commerce".

The petition for the enforcement of the Board's order is granted.

4. See N. L. R. B. v. Denver Building & Construction Trades Council, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284; International Brotherhood of Electrical Workers v. N. L. R. B., 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299; Local 74 United Brotherhood of Carpenters & Joiners of America, A. F. of L. v. N. L. R. B., 341 U.S. 707, 71 S.Ct. 966, 95 L.Ed. 1309.

5. N. L. R. B. v. Star Pub. Co., 9 Cir., 97 F.2d 465, 470 and N. L. R. B. v. O'Keefe & Merritt Mfg. Co., 9 Cir., 178 F.2d 445, 449; See also N. L. R. B. v. National Broadcasting Co., 2 Cir., 150 F.2d 895, at page 900, and cases cited therein.

6. N. L. R. B. v. Denver Building & Construction Trades Council, 341 U.S. 675, at page 684, 71 S.Ct. 943, at page 949, 95 L.Ed. 1284.