John J. CUNEO, etc., National Labor Relations Board, Petitioner,

v.

CARPENTERS' LOCAL NO. 15, etc., and Building Trades Council, etc., Respondents.

Civ. A. No. 623–61.

United States District Court
D. New Jersey.

Sept. 22, 1961.

Theodore K. High, Washington, D. C., for petitioner.

Norman Schiff, Newark, N. J., for charging party.

Thomas L. Parsonnet, Newark, N. J., for respondents.

WORTENDYKE, District Judge.

National Labor Relations Board (hereinafter Board), through its Regional Director, has petitioned this Court, pursuant to section 10(*l*) of the National Labor Relations Act, 29 U.S.C.A. § 160(*l*) (hereinafter Act), for injunctive relief pending the Board's final disposition of a complaint under section 8(b) (4) (i) (ii) (B) of the Act, 29 U.S.C.A. § 158(b) (4) (i, ii), (B), filed with the Board on July 28, 1961, by Robin Hood Estates, Inc. (hereinafter Robin Hood), and duly referred to the Regional Director. The Court has jurisdiction of the subject matter under the provisions of the statutory section invoked by the petition, and of the parties. The respondents, Carpenters' Local Union No. 15, United Brotherhood of Carpenters and Joiners of America, AFL-CIO (hereinafter Carpenters) and Building Trades Council of Bergen County, AFL-CIO (hereinafter Council) are labor organizations as defined by section 2(5) of the Act, 29 U.S.C.A. § 152 (5).

Robin Hood, a New Jersey corporation, is engaged in the building and sale of private dwellings upon a tract of land of several acres, abutting upon Kinderkamack Road, in the Borough of Park Ridge, Bergen County, New Jersey. This developer uses, in the prosecution of that project, materials and supplies, aggregating in value in excess of $50,000, which are shipped to the job site directly from points outside of the State of New Jersey. Robin Hood subcontracted the carpenter work in its development to Loverchio Bros., Inc. (hereinafter Loverchio), and the work appropriate for other crafts to other subcontractors.

Carpenters had long but unsuccessfully attempted to induce Loverchio to recognize and bargain with Carpenters as the representative of Loverchio's employees. Although neither of the respondents has had nor has any labor dispute with Robin Hood, a picket line was established on July 11, 1961, and has since been continuously maintained, at the entrance to Robin Hood's aforesaid development project. The Regional Director alleges that the establishment and maintenance of this picket line was and is in furtherance of respondents' dispute with Loverchio; but that, by means of this picketing, respondents have appealed to employees of other subcontractors on the project not to perform services for their employers thereat, or to deliver materials and supplies thereto. Petitioner contends that objects of respondents' picketing were and are to compel Robin Hood and others to cease doing business with Loverchio; to compel other subcontractors on Robin Hood's project to cease doing business with Robin Hood; and to force Loverchio to recognize or bargain with Carpenters as the representative of Loverchio's employees.

The order to show cause allowed by this Court upon the filing of the petition on August 8, 1961 was made returnable on August 17, but the return thereof was continued to August 29, 1961, upon which latter date, and the day following, testimony was presented in behalf of the respective parties. Respondents' answer was filed August 22, 1961. At the

conclusion of the presentation of evidence the Court reserved decision.

■ It is not my function to determine whether, *in fact*, an unfair labor practice has been engaged in, but only whether reasonable cause exists to believe that such a statutory violation occurred. Madden v. International Hod Carriers' etc., 7 Cir., 1960, 277 F.2d 688, certiorari denied 364 U.S. 863, 81 S.Ct. 105, 5 L.Ed.2d 86; Douds v. Milk Drivers' etc., Union, 2 Cir., 1957, 248 F.2d 534; Schauffler v. Highway Truck Drivers' Local 107, etc., 3 Cir., 1956, 230 F.2d 7. In Highway Truck Drivers Local 107, supra, Judge Goodrich reminds us on page 9 of 230 F.2d that "section 10(*l*) * * * requires the district judge to find that there is reasonable cause to believe that a violation of the act as charged has been committed," and on page 13 of 230 F.2d that "[w]hen this case is heard on the merits it may, or may not, be that the labor board will find the respondent unions guilty of conduct forbidden by the statute."

The Robin Hood development lies within the territorial jurisdiction of both of the respondents. Loverchio, the subcontractor for the carpenter work, employed non-union workmen on that job. Council is an association of craft locals which are represented therein by elected delegates from the locals. Council has no written constitution or by-laws, although it elects officers, which include a president and a secretary. At all times herein relevant Harry E. Brennan was president of Council, and was also a delegate thereto from a local of the painters' union. Members of that local were employed on the Robin Hood job. In his capacity as president of Council, Mr. Brennan usually acted after previous authorization by Council; but in cases of emergency, he would occasionally take action in behalf of Council, subject to subsequent ratification by majority vote of the members thereof. One, Spotholtz, the secretary of Carpenters, is also secretary of Council.

Ernest H. Johnson and Louis O. Petrie were duly elected business agents of Carpenters' Local 15, and authorized to act for Carpenters in establishing and maintaining a picket line in furtherance of the Local's interests. Concurrently with its operations at the Park Ridge development site, Robin Hood (or Wells, its controlling stockholder) was constructing another housing development in the Borough of Norwood, in Bergen County, upon which the carpenter work had also been subcontracted to Loverchio. Upon an occasion several weeks prior to the setting-up of the picket line at the Park Ridge site, Johnson, as business agent of Carpenters, discussed with Wells, the president of Robin Hood, on the latter's Norwood job, the matter of Loverchio's operations on that job, in which the latter was also employing non-union personnel. On this occasion, Johnson ordered certain union members employed by Loverchio off the Norwood job, and informed Wells that the Carpenters' Local would picket any job on which Loverchio might thereafter be working. Accordingly, on July 11, 1961, after obtaining advice of counsel, a picket line was established by Petrie, of Carpenters, at the entrance to the Robin Hood tract in Park Ridge, and the picketing thus commenced has continued daily without interruption, ever since.

■ Prior to their incorporation, the brothers Loverchio had been members of the Carpenters' Union. Subsequent to the incorporation, Johnson, as president of Carpenters, had been endeavoring to induce the Loverchios to enter into a contract with the union. Failing of success in these efforts, Johnson threatened to remove union men from Loverchio's jobs. At Glenwood Manor, the Norwood development which Wells, the president of Robinhood, was carrying on, Johnson renewed his threat to Loverchio and informed him that he (Johnson) would picket any future job upon which Loverchio might be employed. On the same occasion, Johnson inquired of Wells why Robin Hood was operating a non-union job; and subsequently, Brennan, as representative of the painters' local and president of Council, also asked Wells whether he was going to keep Loverchio

on the job. Upon receipt of an affirmative answer to his inquiry, Brennan said he wanted to be rid of Loverchio because he was non-union, and that "the boys" would not stand idly by if Loverchio continued to work on the job, but would make a union job of it. A few days after the picket line at Robin Hood's Park Ridge tract was established, Wells inquired of Petrie whether the picketing would cease if Loverchio were "thrown out." Petrie answered in the affirmative as far as the Carpenters were concerned, but stated that he could not speak for the locals of the other crafts employed on the job, and that he would have to discuss that aspect of the situation with Brennan, the president of Council. Accordingly, a meeting was arranged, by Petrie at Wells' request, at the joint headquarters of Carpenters and Council, which was attended by representatives of Carpenters and of other crafts which were members of Council, as well as by Brennan, Wells, and an attorney for the latter. During the course of the conference when a discussion commenced respecting legal rights and duties relevant to the subject of discussion, Brennan left the meeting, which shortly broke up without accomplishing its intended purpose. I am not persuaded by the evidence that the picketing has been or is likely to be successful either in inducing employees of neutral employers to refrain from working, or Robin Hood to oust Loverchio as one of its subcontractors. This Court is concerned, however, not with the matter of the success or failure of the picketing to achieve its objectives, N. L. R. B. v. Dallas General Drivers, etc., Local No. 745, 5 Cir., 1959, 264 F.2d 642, certiorari denied 361 U.S. 814, 80 S.Ct. 54, 4 L.Ed. 2d 61, but merely whether there is reasonable cause to believe that *an* object of the picketing was one of those proscribed by the statute as an unfair labor practice on the part of either or both of the respondents.

During the normal work week, the pickets carry signs bearing the legend: "Loverchio Bros. Unfair to Carpenters Local 15. Please do not Work for Loverchio Bros." The signs carried by the pickets on week-ends, including Sundays, carry a somewhat different legend, reading as follows: "Non Union Labor has been Employed in the Construction of This Project. Carpenters Local 15." Carpenters assumed that no work was being performed at the job site by Loverchio on week-ends; but Loverchio's employees occasionally worked there at those times. The picket line is located at the sole vehicular entrance to Robin Hood's development. Workmen of various crafts are employed by subcontractors at the job site, and supplies and materials have been from time to time delivered by vehicle to the site over Royal Road, the access street at the entrance to which the picket line was established. Brennan, the president of Council, Petrie, and Johnson, together with representatives of other crafts represented on Council, have participated in the picketing. On the first day of the picketing, two trucks, each belonging to a different subcontractor and carrying materials for the project, stopped near the entrance to the job site while the drivers inquired respecting the reason for the picketing. Each vehicle thereafter continued into the development, where it completed its mission. Neither truck driver testified. On one occasion, two or three days after the commencement of the picketing, a power-shovel operator, employed by one of the subcontractors on the job, was accosted by one of the pickets who asked why he "wouldn't go out" with them, but he was not threatened nor prevented from carrying on his work. Had any of these persons refused to cross the picket line, the adverse impact of their refusal would have affected Robin Hood more than Loverchio.

It is undisputed that, at least until the commencement of the picketing, Carpenters had attempted to persuade or compel Loverchio to recognize and bargain with Carpenters' Local Union No. 15 as the representative of Loverchio's employees, and that Carpenters have not been certified as such representative under the provisions of section 9 of the Act,

29 U.S.C.A. § 159. Neither of the respondents in this case has any labor dispute with Robin Hood, nor with any contractor or material supplier, other than Loverchio, at Robin Hood's Park Ridge project. There have been times during the continuance of the daily picketing at the project when no Loverchio employees were present on the site.

Petitioner has alleged and endeavored to prove that the picketing at Robin Hood's Park Ridge job site was jointly participated in by Council and by Carpenters. Although Brennan, the president of Council, and other delegates to that association served as picketers, respondents contend that such participation was in their respective individual capacities, and not as representatives of Council. I conclude from the testimony that the various other craft locals represented on Council made common cause with Carpenters in establishing and maintaining the picketing complained of, and that Council has aided and abetted the practice complained of.

It is the further contention of petitioner that there exists reasonable cause to believe that the objects of the picketing are to force Robin Hood and its other subcontractors to cease doing business with Loverchio, and to force Loverchio to recognize or bargain with Carpenters as representative of Loverchio's employees, despite the fact that Carpenters has not been certified as such representative under the provisions of section 9 of the Act. The unfair labor practices charged by petitioner include that described in section 8(b) (4) (ii) (B) of the Act. This provision declares that it is an unfair labor practice for a labor organization or its agents "(ii) * * * to threaten, coerce, or restrain any person engaged * * * in an industry affecting commerce, where * * * an object thereof is— * * * (B) forcing or requiring any person * * * to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organ-

ization has been certified as the representative of such employees under the provisions of section 9: *Provided*, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing; * *." Respondents contend that the picketing complained of is lawful because primary in character, despite the conceded fact that the picketing is being maintained upon a common situs upon which other employers, in addition to the employer being picketed, are conducting operations.

 McLeod, Regional Director, etc., v. Hempstead Local No. 1921, United Brotherhood of Carpenters, etc., D.C.E.D. N.Y.1960, 183 F.Supp. 494 was a case in which a housing developer, with subcontractors, let his carpentry work to one Benson, a non-union self-employed workman. The business agent of the local threatened to picket the job unless the carpenter joined the union and hired a union carpenter. Benson refused and picketing began at the entrance to the development tract. Signs carried by the picket read, "Concord Estates Paul Weissbluth Employs Non-Union Carpenter Contractors." (Weissbluth was the executive officer of the developer.) Water-main subcontractor's employees and others walked off the job and refused to enter the site. The Court concluded that the object was to have Benson join the union or, failing that, to have the developer hire a union contractor in Benson's stead. The Board had reasonable cause to believe there were violations of sections 8(b) (4) (A) and (B), and cited N. L. R. B. v. Denver Bldg. & Construction Trades Council, 1951, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284; and N. L. R. B. v. United Construction Workers, 4 Cir., 1952, 198 F.2d 391, certiorari denied 1952, 344 U.S. 876, 73 S.Ct. 170, 97 L.Ed. 678. Here, as in N. L. R. B. v. International Hod Carriers, etc., Local No. 1140, 8 Cir., 1960, 285 F.2d 397, 400, certiorari denied 366 U.S. 903, 81 S.Ct. 1047, 6 L.Ed.2d 203, respondents insist that they have met the "Moore Dry Dock tests"

(Sailors' Union of the Pacific v. Moore Dry Dock Company, 92 N.L.R.B. 547) because "a) the picketing is strictly limited to times when the situs of dispute is located on the secondary employer's premises; b) at the time of the picketing the primary employer is engaged in its normal business at the situs; c) the picketing is limited to places reasonably close to the location of the situs; and d) the picketing discloses clearly that the dispute is with the primary employer." However, as pointed out in Hod Carriers, supra, 285 F.2d at page 401, "These tests * * * are to be employed in the absence of more direct evidence of the intent and purposes of the labor organization" in picketing. Where, as I find here, the evidence discloses that Carpenters was no longer desirous of securing a contract with Loverchio, but, nevertheless, disclosed an intent to maintain the picket line only so long as the secondary employer continued to *do business* with the primary employer, the conclusion is justified that an object of the picketing was to force Robin Hood to cease doing business with Loverchio. Such an object is proscribed by section 8(b) (4) (ii) (B) of the Act. See Superior Derrick Corp. v. N. L. R. B., 5 Cir., 1960, 273 F.2d 891, certiorari denied 364 U.S. 816, 81 S.Ct. 47, 5 L.Ed.2d 47.

The question whether an object of a strike on a building construction job was to force the contractor to terminate the contract of a subcontractor was presented in N. L. R. B. v. Denver Building and Construction Trades Council, 1951, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284, and there answered in the affirmative; thus resulting in a reversal of the Court of Appeals, 87 U.S.App.D.C. 293, 186 F.2d 326, which had found to the contrary. The respondents in that case had contended that their dispute was primary with the general contractor alone, and that their object was to make the construction project an all-union job. The electrical subcontractor employed nonunion men. Prior to completion of the subcontract the subcontractor was notified to get off the job so that it could be completed by the general contractor. The picket was removed and thereafter the union employees resumed work on the project. The subcontractor filed a charging complaint with the Board, charging that an object of the respondents was to force the general contractor to cease doing business with the subcontractor on that project. In reaching its conclusion that an object of the strike was to force the contractor to terminate the subcontract, and that therefore the strike constituted an unfair labor practice, the Supreme Court reasoned (at page 688 of 341 U.S., at page 951 of 71 S.Ct.), as follows: "If there had been no contract between * * * (the general contractor) and * * * (the subcontractor) there might be substance in their (respondents') contention that the dispute involved no boycott. If, for example, * * (the general contractor) had been doing all the electrical work on this project through its own nonunion employees, it could have replaced them with union men and thus disposed of the dispute. However, the existence of the * * * subcontract presented a materially different situation. The nonunion employees were employees of * * * (the subcontractor). The only way that respondents could attain their purpose was to force * * * (the subcontractor) itself off the job. This, in turn, could be done only through * * * (the general contractor's) termination of * * * (the subcontractor's) subcontract. The result is that the Council's strike, in order to attain its ultimate purpose, must have included among its objects that of forcing * * * (the general contractor) to terminate that subcontract."

In Local 74 United Brotherhood of Carpenters, etc., v. N. L. R. B., 1951, 341 U.S. 707, 71 S.Ct. 966, 970, 95 L.Ed. 1309, following the Denver Trades Council case, supra, "one of the objects * * * complained of was to force" the owner of the building being renovated to cancel his contract with the wall and floor covering contractor, who had declined to enter a bargaining agreement with the local. This was held to be a

secondary boycott, as the term is defined in International Brotherhood of Electrical Workers, Local 501 v. N. L. R. B., 2 Cir., 1950, 181 F.2d 34, affirmed 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299.

If we attach credence to the insistence by the respondent Carpenters that at the time it established the picket line at the Robin Hood tract, it was no longer desirous of obtaining a representation agreement with Loverchio, then its purpose must have been an attempt to punish Loverchio for its persistence in refusing to come to an agreement. Such an objective could be secured by ousting Loverchio from the job. Such ouster could be achieved most effectively by compelling Robin Hood to terminate its subcontract with Loverchio. It is, therefore, difficult, if not impossible, for me to believe that the latter was *not* an object of the picketing complained of. It follows, therefore, that the Regional Director would have reasonable cause to indulge in a similar belief. In Seafarers' International Union, etc., v. N. L. R. B., 1959, 105 U.S.App.D.C. 211, 265 F.2d 585, at page 591, we are told: "Section 8(b) (4) must be interpreted and not merely read literally. No matter how great the pressure on a neutral employer may be when somebody else's place of business is picketed, it is essentially different from the pressure such a neutral feels when his own business is being picketed. This difference in pressure, between that which occurs, somewhat indirectly, when another employer's premises are picketed and that which occurs when a neutral employer's own premises are picketed, is the rationale which must govern the interpretation of Section 8(b) (4)." In the present case the primary employer (Loverchio) was working on the neutral employer's (Robin Hood's) premises. The picketing was set up and maintained at those premises and its threatened impact extended to the neutral employer and to his other subcontractors equally with the primary employer.

 While the picketing has thus far been unsuccessful in forcing Robin Hood to oust Loverchio from the job, or in inducing any employee of any of the crafts working at the site to leave the job, the evidence is, in my opinion, ample to induce the belief that a proscribed object was and is contemplated in the setting up and maintenance of the picket line. I am also impelled to the conclusion that the Regional Director has reasonable cause to believe that the respondent Council was and continues to be equally involved with Carpenters in the violation of the Act charged in the petition here and in the complaint before the Board.

Accordingly, the preliminary injunction sought by the petitioner will be granted. An order in conformity with the views herein expressed may be presented.