Ivan C. McLEOD, Regional Director of the Second Region of the National Labor Relations Board, for and on Behalf of the **NATIONAL LABOR RELATIONS BOARD**, Petitioner,

v.

**NEW YORK MAILERS UNION NO. 6, INTERNATIONAL TYPOGRAPHICAL UNION, AFL-CIO, Respondent.**

United States District Court
S. D. New York.
April 6, 1962.

Stuart Rothman, Washington, D. C., for petitioner. Dominick L. Manoli, Julius G. Serot, Washington, D. C., Samuel M. Kaynard, Jacques Schurre, New York City, of counsel, for National Labor Relations Board.

Sidney Sugerman, New York City, for respondent.

Townley, Updike, Carter & Rodgers, New York City, for News Syndicate, Inc., Andrew L. Hughes, New York City, of counsel.

SUGARMAN, District Judge.

The petitioner, Regional Director of the Second Region of the NLRB (herein the Director), moves that, pending final disposition of the matters involved pending before the NLRB, respondent (herein Mailers Union) be enjoined from striking or engaging in any form of work stoppage against News Syndicate Co., Inc. (herein the News), the charging party before the NLRB.

The charge, which was filed by the News on February 15, 1962, alleges that on or about February 9, 1962 and since then the Mailers Union has induced per-

sons employed by the News to refuse to handle its newspapers in order to force the News to assign certain work in connection with the production of its newspapers to members of the Mailers Union rather than to members of another union, to wit, Newspaper & Mail Deliverers Union of New York and Vicinity (herein Deliverers Union).

In order to properly understand the problem presented, one must have a clear picture of the operation involved.

After the News's papers are printed they are carried by conveyors from the presses down to the mail room on the street level of the plant. Heretofore (and at the present time, except for the automatic complex hereinafter described, which services only one press) the papers are manually handled in the process of stacking given numbers of an edition and wiring the stacks into bundles. Members of the Mailers Union (herein mailers) have traditionally handled the process from the end of the conveyor to the point where the bundles are wire-bound. At this point the bundles are taken over by the members of the Deliverers Union (herein drivers) who operate the trucks which carry the bundles away from the News plant for distribution.

The precise place where the mailers relinquish the bundles to the drivers has always been a "fuzzy" area which has produced friction between the mailers and the drivers. In the manual operation the resolution of jurisdiction in the "fuzzy" area depended upon the nature of the particular "run" of a given edition of the papers being handled.

There are two runs of each edition of the News's papers. One is the "mail run"; the other is the "city run" or "direct run".

The mail run represents those bundles of newspapers which are to be delivered usually by carriers to wholesalers generally outside of the metropolitan area. The jurisdiction of the mailers just past the wire-tying machine, during a mail run, has apparently always been accepted by all parties. In a mail run under the manual handling of the newspapers just before they are wired into bundles, the mailer places on top of the bundle a sheet containing the mail address, etc. of the wholesaler for whom the bundle is destined and actually operates the wire tying machine which ties the particular stack of papers into a wire-bound, addressed bundle. Thus, it is not until the bound bundle with the address cover is a complete unit that the mailer turns it over to the driver who moves it out to be loaded on a truck for delivery by the driver to the carrier who forwards it to the out-of-town wholesaler for further distribution.

The manual process in a city or direct run differs from the handling of a mail run in that, although a portion of the newspapers of each edition is similarly stacked and wired, no address cover is put on the bundle because its destination is via the News's truck to a newsstand in the metropolitan area, for retail sale. The distinguishing feature, therefore, in the manual operation of a mail run from a city run is that in the "fuzzy" area, acceptable to all parties, a driver supplants the mailer in operating the wire-tying machine during the city run. Thus, the point of jurisdictional division in the city run has traditionally been before the wire-tying machine whereas, during a mail run it has been beyond the wire-tying machine.

Automation in the stacking and bundling of newspapers is being introduced in the industry. The News installed at its plant a mechanical complex to automatically handle the progress of the newspapers from the time they leave the conveyor which brings them down from one of the presses. Only one such device, as a pilot experiment, has been installed at the News's plant. That device gave rise to a dispute wherein a preliminary injunction also sought by the Director was granted by Judge Dawson on February 9. Immediately thereafter the instant dispute arose.

The automatic complex may be described thus: When the newspapers reach the end of the conveyor which brings

them down from the press, they fall into a box-like structure which is known as the "stacker". Within this box the papers are piled into stacks of a predetermined quantity of newspapers. The stacks then emerge from the side of the stacker onto a moving mesh-like horizontal plane about table height and about three feet wide. This moving plane describes a 90-degree arc, thereby turning the stacks (yet unwired) onto a table-high horizontal conveyor of about the same width and about forty feet long, known as the "Jampol belt".

Between the stacker and the Jampol belt two mailers stand, one inside the arc, who controls and operates the stacker, the other opposite him and outside the arc, who is known as the "bottom wrap man". The latter places an outdated issue of the newspaper on the arc-shaped moving mesh to serve as a bottom wrapper for the pile of papers about to emerge from the stacker.

After the stack of newspapers with the bottom wrapper underneath has proceeded the full 90 degrees of the arc between the stacker and the Jampol belt, it slides onto the Jampol belt for continuation of its progress toward its ultimate goal, the loading platform.

The Jampol is not simply a revolving fabric belt. While it basically is a constantly moving belt, it has above the fabric portion a series of freewheeling rollers so that if at any time the progress of the stacked newspapers is stopped at the end of the run, the rollers will revolve underneath the stacks of newspapers while they are stationary, even though the belt continues to revolve under the rollers. After a stack of newspapers has progressed the length of the Jampol, it comes to a sluice-like device known as a "jogger". This consists of two vertical walls which jog the papers in the stack into a uniformly vertical pile.

As the stack leaves the jogger, it is pushed by an arm, known as the "tray pusher", upon a device known as the "tray". This is a table-high structure which has a different method of moving the stack of newspapers forward in that

a series of small parallel belts set in its top surface engage the stack and move it along. On the vertical side of the tray is a battery of buttons controlling the Jampol belt, the tray pusher, belts #1 and #2 (hereinafter discussed), the tray belts and the wire-tying machine. After traversing the top of the tray the stack enters the wire-tying machine, which binds it into a bundle.

The floor space adjoining the tray on the side containing these buttons is the "fuzzy" area now in dispute.

During a mail run on this automatic aggregate, a mailer stands at the tray, places the destination top wrapper containing the name and address of the out-of-town wholesaler on the individual stack before it goes into the wire-tying machine and operates the wire-tying machine. The bound, addressed and wired bundle then moves from the wire-tying machine to belt #1, which was one of the belts dealt with by Judge Dawson.

Belt #1 is a conventional fabric type belt, continually rolling. It meets at its end in T-shape, belt #2, which was also involved in Judge Dawson's decision. Belt #2 is a similar continually rolling fabric type belt which carries the bundle one way or the other to a baffle or deflector which directs it through an aperture in the wall onto the exterior loading platform where it is then, by means of another conveyor, brought up and into a delivery truck.

The bone of contention dealt with by Judge Dawson involved jurisdiction over the operation of belts #1 and #2 during a *mail run*. Belts #1 and #2 can each be operated by dual control buttons, one at the tray as aforesaid and the other on the loading platform outside. The News decided to split the jurisdiction of belts #1 and #2, giving control of belt #1 to a mailer and control of belt #2 to a driver. Each union claimed both buttons and threatened a work stoppage to enforce its claim. Thereupon the News filed a charge with the NLRB against both unions. Pending the resolution of that charge the Director sought a preliminary injunction, which was granted by Judge

Dawson on February 9, the effect of which was to sustain the News's determination, pending final resolution of the dispute that a mailer operate belt #·1 from the button at the tray and that a driver operate belt # 2 from the button outside the mail room on the wall at the loading platform.

The problem was, however, only half solved because, as above pointed out, a mailer traditionally worked the process up to and including the wire-tying operation on a mail run. Under Judge Dawson's ruling a mailer would *pendente lite* continue to remain at the tray during mail runs, placing the addressed top wrappers on the stacks, wire-tying them into bundles and operating the buttons controlling all segments of the process except the button governing belt #·2, control of which was *pendente lite* vested in a driver outside on the loading platform.

That was the state of affairs in the "fuzzy" area during the mail run of the One Star Edition of the News on the night of February 9, 1962.

When the mail run had been completed and the city run of the One Star Edition commenced, the mailer, who had until then presided over the tray and had jurisdiction of the Jampol belt button and the button controlling belt # 1, was replaced pursuant to the News's direction by a driver. This was substantially in accordance with the prevailing practice employed in the manually operated process above described, because the mailer during a city run becomes a checker, i. e., he does not have any address covers to apply to the stacks before they are wired nor does he operate the wire-tying machine. Instead, during the city run the mailer checks and records the number of bundles going through the wire-tying machine. During the progress of the city run of the One Star Edition on the night of February 9, there were two men at the tray with the various buttons more or less accessible to both of them, i. e., a driver in front of the tray and a mailer acting as a checker at the driver's right side, both facing the tray.

When the city run of the One Star Edition was completed, the next distribution was to be the city run of the Two Star Edition. At that point the mailer, who would still act as a checker during the city run of the Two Star Edition, was on the News's direction removed from his position proximate to the tray and was stationed some eight feet away, parallel with belt # 1 and near belt # 2, doing his checking from that point. This effectively deprived the mailer of access to the buttons at the tray.

This was deemed by the Mailers Union to be a violation of its agreement with the News as to jurisdiction over the Jampol belt. Officers of the Mailers Union were called, a dispute ensued between them and the representatives of the News, and the latter were advised that unless the mailer was restored to his position at the tray, to be within operating distance of the buttons the mailers would walk out. It was then necessary for the News to shut down the entire automatic system and to employ, from the particular press to which that system had been geared, the alternate old method of manually handling the newspapers. Thereafter the News filed its second charge with the NLRB, which was followed by the institution by the Director of the within proceeding seeking a preliminary injunction.

In his petition for preliminary restraint the Director asserts that the Mailers Union by its conduct on the night of February 9, 1962 violated Labor Management Relations Act, Sec. 8(b) (4) (i) (ii) (D), 29 U.S.C.A. § 158(b) (4) (i, ii) (D). That section reads:

"Sec. 8 * * * (b) It shall be an unfair labor practice for a labor organization or its agents—* * *

"(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any ·goods, articles, materials or commodi-

ties or to perform any services; or (ii) to threaten, coerce or restrain any person engaged in commerce or in any industry affecting commerce, where in either case an object thereof is: * * * (D) forcing or requiring any employer to assign particular work to employees in a particular labor organization * * * rather than to employees in another labor organization * * *."

The Mailers Union opposes the petition upon the grounds that it does not seek to force the News to assign the work at the tray during the city run to its members *rather than* to members of the Deliverers Union. Counsel for the Mailers Union stated its position at the hearing in these words:

"Here there isn't any aspect in the issues of a jurisdictional dispute at all, the drivers are claiming nothing. As a matter of fact, they claimed nothing and there is no allegation in Mr. McLeod's petition that the drivers were claiming anything. There is an allegation that the News assigned certain work to them. There is an allegation that the mailers claimed that work.

"The only factual issue that is left in this case is whether the mailers union which concededly did claim the operation of the Jampol belt claimed —that is, claimed the assignment to it rather than to the drivers or the deliverers union. We do not contend that the work does not belong to the drivers or the deliverers union; we don't know whether it does or not under their contract. We don't know the basis on which it was assigned to the deliverers but we do claim that under our contract it belonged to us.

"* * * We have no dispute at all with the drivers union but I think the only issue in this case now, because we will for the purposes of expediting the case, concede everything else, the only issue is whether or not the action the mailers union took on February 9, 1962 was with the object of getting the assignment rather than having it go to the drivers or whether as we contend, it was with the object of getting the assignment, period.

"* * * The only position we wanted the publisher to change was the position that the mailers should not be assigned to it. We wanted them to change that and assign us to it. If they wanted to featherbed the job by assigning the deliverer and they have done it before and various other publishers have done it, that is their business.

"* * * the publisher had bigamous contracts with us and the deliverers and if it has done so, that is its business. The Court is not nor is the Board in our view to rescue the publisher from having made such contracts under which we have a rightful claim to the work. We can't say that our end of the bigamous contract is legal and enforceable and the drivers' end of the bigamous contract is not. We don't know whether theirs is or not."

Counsel for the Mailers Union restated its position in his brief thus:

"* * * the Board fatally errs in indiscriminately characterizing every dispute as to jurisdiction as a 'jurisdictional dispute' and applying a mechanical rule to its disposition. In the instant case, as in the related one before Judge Dawson, the Board falls into this error, and would have the Court compound it, by totally ignoring the complete and actual insulation of each union's claim from the other's and the lack of any dispute whatever between them. Rather, the evidence is overwhelming and uncontroverted that the dispute is solely between union and employer for the latter's violation of a contractual grant by withholding from and depriving the group represented by that union of the work assignment to which it is thereunder entitled. That a 'rival' union may likewise

make claim upon that employer under its own separate, possibly identical contract provisions, may spell 'bigamy' but in no way transmutes the several claims into a 'jurisdictional dispute' between the two wronged and unrequited unions from which to rescue the improvident or irresponsible 'two-timing' employer. * * *"

Work assignment at the various stations of the automatic complex above described was the subject of negotiation between the News and the Mailers Union before the system was put into operation. Those negotiations resulted in an agreement on August 3, 1961 between the News and the Mailers Union. That agreement does not bear out the contention of the Mailers Union that the News had contracted to assign to a mailer the position, either with or without a driver, at the tray during a *city run*. In my view, it indicates quite the contrary for it provides that:

"For a period of 18 months from August 1, 1961 the initial installation of the Cutler-Hammer Stacker when in use in The News Mail Room *and operated by members of the Mailers' Union* will be manned as follows: One Mailer will be located at the Stacker itself, another Mailer will be stationed so as to handle the bottom wrapper, and another Mailer will be stationed to handle the top wrapper at the wire-tying machine in accordance with present practice. *When the Mailers are not operating the wire-tying machine,* nevertheless, one Mailer will be located at the Stacker itself, another Mailer will be stationed so as to handle the bottom wrapper. This does not preclude that additional Mailers may be needed if conditions arise." (Emphasis supplied.)

To me the foregoing manifests that *during a mail run* a mailer would be stationed at the tray to apply the top wrappers to the stacks, to operate the wire-tying machine and to operate all of the

buttons (except the button controlling belt # 2, which was to be operated by a driver from the dual control on the loading platform) thereby controlling the operation to the point where the drivers traditionally took over jurisdiction of the bundles which, as Judge Dawson held, was where belt #'1 met belt # 2. It also persuades me that the mailer, who was thus stationed at the tray during the *mail run*, was not to be stationed there during the *city run* "when the Mailers are not operating the wire-tying machine". By providing that one mailer would be located up at the "stacker *itself*" and another opposite him at the 90-degree arc mesh conveyor to apply the bottom wrappers and by deliberately omitting any reference to a mailer being stationed at the wire-tying machine when a mailer was not operating that machine, i. e., traditionally during a *city run*, the agreement spells out, not as contended by the Mailers Union that the News had contracted to keep a mailer at the tray during a city run but quite the contrary, that the News had not thus contracted and was therefore free to exercise its managerial judgment to use the mailer (normally at the tray during a mail run) as it saw fit during a city run.

The mailer did not become cemented to the spot adjacent to the tray because he was allowed to flank the driver during the city run of the One Star Edition on February 9, 1962. When the city run of the Two Star Edition began that night the News saw fit (agreeable to the traditional practice of using the mailer who presided over the wire-tying machine during a mail run) to use him as a checker, to keep track of the bundles during the city run, and the News had the right to indicate where that checker should stand.

If, as an incident to moving the mailer away from the tray during the city run of the Two Star Edition, he was deprived of access to the buttons controlling the operation of the process in back of the wire-tying machine, the Mailers Union cannot be heard to complain because, as above pointed out in its agreement of August 3, 1961 with the News, no provi-

sion was made during a city run for a mailer to remain at the tray.*

In this connection it should be borne in mind that Judge Dawson determined that in a *mail run* the division of jurisdiction takes place at the end of belt # 1 where it abuts belt # 2. It is my view that in a *city run* the division of jurisdiction (accommodating the automatic complex to traditional manual handling practices) takes place where the tray abuts upon the wire-tying machine.

I parenthetically suggest that if the News and the Mailers Union are seriously disposed to settle this difference by negotiation pursuant to Sec. 10(k) of the Labor Management Relations Act, 29 U.S.C.A. § 160(k), they might do so by the News moving from the battery of buttons at the tray those governing the tray, the tray pusher and the Jampol to a point nearer where the mailer was directed to stand to check the bundles at the beginning of the city run of the Two Star Edition or by installing dual control buttons for those sections of the complex at that point.

Obviously the instant application differs from that before Judge Dawson in that in the earlier application before him both the Mailers Union and the Deliverers Union were in contention as to both buttons governing belts # 1 and # 2. In the instant application only the button controlling the Jampol is involved although it would appear that others controlling the tray and the tray pusher are in the same category. Obviously there was no purpose in the Deliverers Union contending for the position at the tray which it already had. It is fair to assume that if the News were to replace the driver at the tray during the city run with a mailer, the Deliverers Union would then be in contention with the Mailers Union for the spot. It is completely unrealistic to assume otherwise and the Director had "reasonable cause to believe", as provided in Sec. 10(*l*) of the Act, that the News's charge was true, warranting the request for a preliminary injunction and the issuance of a complaint.

The Mailers Union cannot escape the implications of its action on the night of February 9, 1962 by asserting that it is not in contention with the Deliverers Union for the spot but merely seeks to force the News to adhere to a contract agreement which does not exist.

Accordingly, the motion for a preliminary injunction is granted. This decision shall constitute the findings of fact and conclusions of law. Settle an order which shall contain a provision that the Mailers Union may apply for the vacatur

---

* In fact, at the hearing the President of the Mailers Union, in giving the background which led up to the agreement of August 3, 1961, testified as follows:

"Q. At the time of the installation of the Cutler-Hammer stacker at the News at press No. 1 were there conversations and discussions between representatives of the New York Mailers Union and the News concerning the manning and operation of that new installation?

"A. Yes, there were.

"Q. Was a total agreement finally reached with the News by the New York Mailers Union No. 6 as to the manning of the Cutler-Hammer stacker from the stacker all the way down through the mail room and out as to the manning?

"A. Yes.

"Q. Under that agreement how many men were you to have assigned to the manning of the Cutler-Hammer stacker at all times?

"A. I think, if I may, there are two different times. One is on the mail run and one is on the city run.

"Q. On the mail run how many?

"A. On the mail run we had three, the man at the stacker, the man at the bottom wrap and the man at the wire machine.

"Q. On the city run?

"A. On the city run we had the man at the bottom wrap, the man at the stacker and a man who was on the wire machine moved back and became the checker or delivery clerk but he is not included in the manning as such.

"Q. So that the manning of the stacker for the city run consisted of two specifically assigned men and then this delivery clerk who was a kind of floating mailer in the vicinity of this operation, is that correct?

"A. Yes. * * *"

of the preliminary injunction if the NLRB does not issue a complaint within 30 days or does not enter its order thereon within 120 days of the date of the order to be settled hereon.