John F. LEBUS, Regional Director of the Fifteenth Region of the National Labor Relations Board, for and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

SEAFARERS' INTERNATIONAL UNION OF NORTH AMERICA, ATLANTIC, GULF, LAKES AND INLAND WATERS DISTRICT, AFL–CIO and Seafarers' International Union of North America, AFL–CIO, Respondents.

Civ. A. No. 67–1879.

United States District Court
E. D. Louisiana,
New Orleans Division.

Jan. 11, 1968.

Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Julius G. Serot, Asst. Gen. Counsel, Charles M. Paschal, Jr., Regional Atty., Thomas D. Johnston, Stanley Mustel, Attys., N. L. R. B., New Orleans, La.,

John F. LeBus, Regional Director, N. L. R. B., pro se, for plaintiff.

William Wright, New Orleans, La., for Delta SS Lines, Inc.

Howard Schulman, New York City, and C. Paul Barker, New Orleans, La., for SIU.

CASSIBRY, District Judge:

This is an injunction proceeding in which the Regional Director of the Fifteenth Region of the National Labor Relations Board has filed on behalf of the Board a petition for a temporary injunction under Section 10(1) of the National Labor Relations Act, as amended,[1] pending the hearing and determination by the Board of a complaint issued by it alleging that the Seafarers' International Union of North America, Atlantic, Gulf, Lakes and Inland Waters District, AFL–CIO, (SIU A & G) and Seafarers' International Union of North America, AFL–CIO (SIU NA), have engaged in, and are engaging in, unfair labor practices proscribed by Section 8(b) (4) (i) (ii) (D) of the Act.[2]

[1]. 61 Stat. 146; 73 Stat. 544; 29 U.S.C. § 160(*l*).

The pertinent part provides that—

"Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4) (A), (B), or (C) of section 8(b), or section 8(e), or section 8(b) (7), the preliminary investigation of such charge shall be made forthwith and given priority over all other cases except cases of like character in the office where it is filed or to which it is referred. If, after such investigation, the officer or regional attorney to whom the matter may be referred has reasonable cause to believe such charge is true and that a complaint should issue, he shall, on behalf of the Board, petition any district court of the United States (including the District Court of the United States for the District of Columbia) within any district where the unfair labor practice in question has occurred, is alleged to have occurred, or wherein such person resides or transacts business, for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter. Upon the filing of any such petition the district court shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems just and proper, notwithstanding any other provision of law: * * * Upon filing of any such petition the courts shall cause notice thereof to be served upon any person involved in the charge and such person, including the charging party, shall be given an opportunity to appear by counsel and present any relevant testimony: *Provided further*, That for the purposes of this subsection district courts shall be deemed to have jurisdiction of a labor organization (1) in the district in which such organization maintains its principal office, or (2) in any district in which its duly authorized officers or agents are engaged in promoting or protecting the interests of employee members. * * * In situations where such relief is appropriate the procedure specified herein shall apply to charges with respect to section 8(b) (4) (D)."

[2]. "It shall be an unfair labor practice for a labor organization or its agents—

"(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the

The Board issued the complaint against the respondents on a charge filed by Delta Steamship Lines, Inc., a Louisiana corporation engaged in the transportation by ship of passengers and cargo between ports of the United States' Gulf of Mexico, West Africa, East Coast of South America, Caribbean Sea, and Mexico, alleging that the respondents had since, on or about November 22, 1967, interfered with the operation of certain of its vessels by engaging in work stoppages, etc., with the object of compelling Delta to assign certain work to respondents' members rather than to Apprentice Engineers, members of National Marine Engineers Beneficial Association, District 1. (MEBA) After the Board's investigation of Delta's charge, it concluded that there was reasonable cause to believe that the respondents were engaged in unfair labor practices and it issued notices that a hearing under Section 10(k) of the Act would be held to determine the dispute. The Board's petition in this Court for injunction is based upon the asserted reasonableness of its belief that the respondents' actions interfering with or disrupting the operation of Delta's ships were done with an object of forcing Delta to assign the work of being trained to become apprentice engineers to the respondents' employees which would entitle it to a temporary injunction under Section 10(l) of the Act. The respondents contend that the actions which interfered with the operation of Delta's ships cannot be regarded as unfair labor practices because the SIU A & G has a certification from the Board which under 8(b) (4) (D) excepts its actions from such a charge, because the dispute here is one of breach of the collective bargaining contract which SIU A & G has with Delta, and because the pleadings of the Board show that no "work" within the contemplation of Section 8(b) (4) (D) is involved in this dispute. The Board denies that the SIU A & G has the certification claimed, and argues that a claim for assignment of work based on contract does not exonerate a union from a charge of unfair labor practice under Section 8(b) (4) (D).[3]

The Board initially prayed for a temporary restraining order which the Court denied because it was unclear from the pleadings that this dispute was one over an "assignment of work" under Section 8(b) (4) (D) which would give the Court jurisdiction to grant injunctive relief under Section 10(l) of the Act as claimed in the petition.

In the hearing before the Court on the issuance of a temporary injunction, the evidence adduced by the Board to prove the reasonableness of its belief that the respondents engaged in unfair labor practices showed that the dispute arose when MEBA put into effect its Apprentice Engineer Program aboard two of Delta's ships. The dispute was brought

course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—
"(D) forcing or requiring any employer to *assign particular work* to employees in a particular labor organization or in a particular trade, craft, or class *rather than* to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work: * * *" (Emphasis added)

3. It cites:
N.L.R.B. v. Local 1291, International Longshoremen's Ass'n, 345 F.2d 4 (C.A. 3), cert. denied 382 U.S. 891, 86 S.Ct. 183, 15 L.Ed.2d 149; N.L.R.B. v. Local 825, International Union of Operating Engineers, 326 F.2d 213, 218 (C.A. 3); Douds v. International Longshoremen's Ass'n, 242 F.2d 808, 812 (C.A. 2); McLeod for and on Behalf of N.L.R.B. v. New York Mailers' Union No. 6, 205 F. Supp. 479, 485 (S.D.N.Y.); McLeod v. New York Paper Cutters & Bookbinders' Union, 53 LRRM 2380 (E.D.N.Y., decided May 31, 1963); Hoffman v. Painters Union, 64 LRRM 2762 (N.D.Calif., decided April 3, 1967).

about by the following facts and circumstances.

The ships of the Delta Line, like other American flagships, are subject to regulations of the United States Coast Guard. The Coast Guard has defined generally two categories of employees aboard the ships. One category consists of the licensed officers including the licensed engineers, and the other category consists of the unlicensed personnel defined under the regulations as seamen. Delta had a contract with SIU A & G, under which the SIU A & G was the sole bargaining agent for the unlicensed personnel aboard Delta's ships, with certain exceptions not relevant here, and all unlicensed personnel would be supplied by SIU A & G, and Delta also had a contract with MEBA for its licensed engineers. The unlicensed personnel in the engine room of the ships could become licensed engineers through their experience in work in the engine room and by study when they passed the Coast Guard examination for the licensing of engineers. MEBA inaugurated a plan for training its members to become engineers through attendance at certain training schools followed by work experience aboard ships. In order to make the latter possible it was necessary to have the Coast Guard recognize these trainees in its regulations as personnel for the ships. After a hearing, MEBA was successful in 1966 in having the Coast Guard establish a rating of "Apprentice Engineer." Code of Federal Regulations, Title 46, as rev'd January 1, 1967.

Captain E. J. Worrel, United States Coast Guard, testified that under the rating established by the Regulations for Apprentice Engineer, he was unlicensed personnel. According to this witness, who had about 25 years' experience in Merchant Safety, prior to the Apprentice Engineer Program, about 30 percent of the licensed engineers came from advancement through the unlicensed ratings, about 30 percent came from the Merchant Marine Academy and the rest came from the Navy and Coast Guard. The test given by the Coast Guard for licensing is based on the practical information that a man picks up in the engine room plus certain academic subjects which he has to pick up elsewhere, through manuals or schools.

On June 6, of 1966, MEBA forwarded to Delta a Memorandum of Understanding which was in effect an amendment of its existing contract for licensed engineers to provide for its program for training Apprentice Engineers aboard Delta's ships. According to Captain John W. Clark, President of Delta, the company hesitated to sign this Memorandum and examined it and the SIU A & G Agreement for possible conflicts. During its delay in signing the Memorandum, a shortage of engineers was experienced by the company. After Delta capitulated to MEBA's pressures and signed on July 6, 1966, this situation improved noticeably.

Apparently without giving Delta's operating division any notice of its intended action to implement the program permitted under the Memorandum of Understanding, MEBA placed two apprentice engineers aboard two of Delta's ships in November, 1967. Duane Dennis went aboard the Del Sol at Port Arthur, Texas, on November 9, 1967. Another apprentice, Robert Guidry, was assigned aboard the Del Santos. When SIU A & G learned of the presence of these two apprentices aboard the ships, it protested to Delta that their presence violated the hiring and seniority provisions of its collective bargaining agreement with Delta and demanded that the apprentices be removed.

Captain Clark immediately began efforts to resolve the difficulty but these efforts were unavailing. The MEBA officials refused to remove the apprentices, and SIU A & G rejected Captain Clark's suggestion that it become the representative for these apprentices. Captain Clark finally gave the order that no work was to be assigned the apprentices aboard ship and this failed to satisfy SIU A & G also. Its unequivocal position was that it would accept nothing less than actual

physical removal of the apprentices from the ships.

When Delta did not accede to this demand, the SIU A & G commenced on or about November 22, 1967, and continued at intervals through December, to engage in picketing and refusing to supply personnel for the following vessels owned or operated by Delta: S. S. Del Mar at Houston, Texas; S. S. Del Rio at Mobile, Alabama; S. S. Del Valle at Galveston, Texas; S. S. Del Mundo, the M/V Del Monte, the· S. S. Del Norte, M/V Del Campo at New Orleans, Louisiana; S. S. Carroll Victory at Savannah, Georgia. The action of SIU A & G resulting in the interference with the operation of the ships continues to the present time except as to one, the S. S. Carroll Victory at Savannah, Georgia, which has been released on certification by the Admiral in charge of the MSTS (Military Sea Transportation Service) because it was carrying military cargo.

On December 8, 1967, Delta filed its charge of unfair labor practice against the SIU A & G with the Board, and on December 21, 1967, a similar charge was filed against the SIU NA. On December 22, 1967, this petition for injunctive relief pending the hearing and disposition of the dispute by the Board was filed.

The Board has furnished the Court with lengthy and persuasive memorandums regarding its proper function in the determination of the propriety of granting the injunction under Section 10(l) of the Act. It urges that the function of the Court is not to decide definitively whether the acts of the union constitute an unfair labor practice,[4] and that its function is not to determine the merits of the dispute as to which group of employees is entitled to the particular work.[5] The Court's function is, argues the Board, to determine merely if the Board had reasonable cause to believe that the Union was striking for "assignment of work."

Within the confines of deliberation thus urged by the Board, the Court can only conclude from the evidence adduced at the hearing that the Board did not have reasonable cause to believe that the SIU A & G was striking over "assignment of work" within the contemplation of Section 8(b) (4) (D). The Court's view of the case makes unnecessary any resolution of the conflict between the parties as to certification, and of the · issue whether a contractual claim for assignment of work removes a strike from the contemplation of unfair labor practice.

4. They rely on:
N.L.R.B. v. Denver Building & Construction Trades Council, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284; Local 450, International Union of Operating Engineers v. Elliott, 256 F.2d 630 (C.A. 5); Madden v. International Organization of Masters, Mates & Pilots, Inc., 259 F.2d 312 (C.A. 7), cert. denied 358 U.S. 909, 79 S.Ct. 236, 3 L.Ed.2d 229; American Federation of Radio & Television Artists v. Getreu, 258 F.2d 698 (C.A. 6); Douds v. Milk Drivers & Dairy Employees Union, 248 F.2d 534 (C.A. 2); Douds v. Wood, Wire & Metal Lathers' International Ass'n, 245 F.2d 223 (C.A. 3); Printing Specialties & Paper Converters Union v. LeBaron, 171 F.2d 331 (C.A. 9); United Brotherhood of Carpenters and Joiners v. Sperry, 170 F.2d 863 (C.A. 10).

5. The Board cites:
Schauffler v. Local 1291, ILA, 292 F. 2d 182 at 188 (C.A. 3 1961); Douds v.

Milk Drivers & Dairy Employees Union, 248 F.2d at 537 (C.A. 2); Retail, Wholesale and Dept. Store Union v. Rains, 266 F.2d 503, 505–506 (C.A. 5); Local 450, International Union of Operating Engineers v. Elliott, 256 F.2d 630 (C.A. 5); Madden v. International Organization of Masters, Mates & Pilots, 259 F.2d 312, 313–314 (C.A. 7), cert. denied 358 U.S. 909, 79 S.Ct. 236, 3 L.Ed.2d 229; Local Joint Board, Hotel & Restaurant Employees, etc. v. Sperry, 323 F.2d 75, 77–79 (C.A. 8); Local No. 83, Construction, etc. Drivers Union v. Jenkins, 308 F.2d 516, 517–518 (C.A·. 9); American Federation of Radio & Television Artists v. Getreu, 258 F.2d 698, 699, 701 (C.A. 6); Schauffler v. Highway Truck Drivers & Helpers, 230 F.2d 7, 9 (C.A. 3). Cf. N.L.R.B. v. Denver Building & Construction Trades Council, 341 U.S. 675, 681–683, 71 S.Ct. 943, 95 L.Ed. 1284; Brown v. Pacific Telephone & Telegraph Co., 218 F.2d 542, 544–545 (C.A. 9).

The Board's own witnesses proved conclusively to the Court that the SIU A & G has never demanded that its members working aboard the ships with the apprentices be assigned any particular work instead of the apprentices. Captain Clark agreed that he had signed an affidavit for the Board on December 8, 1967, as follows:

"To my knowledge none of the officers or representatives of the S. I. U. ever asked any official or representative of my company to give their union the work which was being performed by M. E. B. A. Apprentice Engineers."

The same witness made it clear that SIU A & G's demand has been consistent, that is, to remove these apprentices from the ships because they are unlicensed personnel and their presence violates the collective bargaining agreement that unlicensed personnel shall be hired exclusively from SIU A & G's membership hall. The particular work assigned to the apprentices is wholly immaterial to SIU A & G's demands. The order of Delta to cease assigning any work to these apprentices had no effect whatever on those demands.[6]

The Board's evidence as to the plan of MEBA for these apprentices aboard ship impresses the Court as being devised so as to forestall any claim by SIU A & G that these apprentices were doing the particular work of its members. It is inescapable from the evidence that the plan afforded SIU A & G no possibility of making a claim for assignment of work.

The Memorandum of Understanding provided specifically that the Apprentice Engineers would be assigned to ships only to substitute in case licensed engineers were not available to furnish a full engine crew of licensed personnel. It further specifically provided that the Apprentice Engineers would not perform work which was the work of the unlicensed personnel, that is, any work assigned to the apprentice should be work which could be assigned to a licensed engineer. How the plan operated in actual practice was explained by a First Engineer and one of the Apprentice Engineers.

Mr. James W. Clinton, the First Assistant Engineer aboard the Del Santos to which one of the apprentices was assigned, testified that the engine crew on such a vessel consisted of licensed personnel including the Chief Engineer, First Engineer, Second Engineer and three Third Engineers, and of unlicensed personnel including three oilers, three firemen, two electricians, one engine utility man and two wipers. The utility man assists the First Engineer in doing mechanical work and the wiper may also assist the First Engineer in doing mechanical work in addition to his duties of general cleaning of the engine room.

On the Del Santos there was a full crew of unlicensed personnel. The licensed crew lacked what is called a Day Third Engineer—a Third Engineer who works a 5-day week. The witness detailed the work assigned to the apprentice while he was on this ship including (1) making up the evaporator feed pump, (2) lagging steam lines, (3) packing cargo pumps, (4) threading pipe, (5) packing the main throttle valves, (6) removing the heads on the auxiliary condenser, (7) removing the heads on the generator cooler, (8) grinding seats on valves, and (9) lagging the shaft alley steam line. When questioned separately as to which personnel would normally be assigned these tasks he invariably answered that *at the discretion* of the First

---

6. The Board introduced the transcript of the hearing held by the Coast Guard for consideration of establishing the Apprentice Engineer rating which contains the testimony of one of the Unions' officials opposing the proposed regulation recognizing Apprentice Engineers as ship personnel on the ground that such a regulation could only give rise to jurisdictional disputes. It contends that this testimony should be considered persuasive in determining that this is an assignment of work dispute. The arguments of the SIU officials in that hearing cannot be regarded as determinative of the nature of future disputes which might arise as a result of the Apprentice Program.

Engineer this assisting work would be performed either by the Third Day Engineer, or the utility man, or in some cases, by the wiper.

The apprentice, Duane Dennis, testified that the MEBA branch office in Port Arthur, Texas, had him assigned aboard the Del Sol after he had attended MEBA's Apprentice Ship School in Baltimore, Maryland, for six months. Neither he nor the licensed engineers signed aboard the vessel until several days after it had departed from Port Arthur. There was no Third Day Engineer on the vessel, and he used the quarters of that engineer, but there was a full engine crew of unlicensed personnel. He performed certain tasks such as (1) replacing the bearings forward and aft on the reefer cargo fan boxes, (2) disengaging the main engine turning gear, (3) unplugging and replacing zinc plates on the main feed pump, (4) cleaning filters in the fan room, (5) maintaining the water level and air pressure in the sanitary tank, and (6) repacking the sanitary pump and the bilge ballast pump. He performed all of this work under the supervision of the Chief Engineer and First Assistant Engineer. These officers gave him strict instructions that he was to do no unlicensed work, but was to do only work which could be done by a licensed engineer. These instructions were in accordance with the school's explanation of the Apprentice Program. He admitted that some of the unlicensed men participated with him in the same work that he did. He was relieved of all physical work when the Chief Engineer received a telegraphic instruction to that effect, and was taken off the ship at Buenos Aires, Argentina on December 22.

It is manifestly clear therefore that no particular task which the apprentice performed could be claimed by the SIU A & G as its work rather than the work of a member of MEBA. The tasks could be performed by either, at the discretion of the First Engineer. It is equally clear from this evidence that the Board cannot determine at the end of its 10(k)

hearing that the SIU A & G's members must be assigned particular tasks rather than MEBA's members. The choice will remain with the First Engineer to determine whether he will be assisted in a particular task by a MEBA member or an SIU A & G member.

The language used by the Board in its pleadings to describe the "work" allegedly claimed by the SIU A & G as its "work" demonstrates the fallacy of the Board's position as to reasonableness in this matter. In paragraph 5(e) of its petition it alleges:

"At all times material, Respondents have demanded that Delta assign the *work of being trained to become licensed engineers,* except for cadets from the Maritime Academy (herein called cadets) to employees who are members of, represented by, or referred by Respondents. * * *" (Emphasis added).

There is no such "work" as "being trained to become licensed engineers" on these vessels. The "work" consists of the tasks as delineated by the First Engineer and the apprentice who testified in this case. "Being trained" *results* from performing those tasks, and is not "work" in itself.

The dispute here is a larger, more comprehensive dispute than, and wholly unrelated to, an "assignment of work" dispute as contemplated by Section 8(b)(4)(D). SIU A & G's interference with the operation of Delta's ships because it considered that the assignment of unlicensed Apprentice Engineers to Delta's vessels violated its collective bargaining agreement to furnish all unlicensed personnel had no object to compel the "assignment of work" aboard these ships to its members rather than to members of MEBA. SIU A & G objects to the Apprentice Engineers being aboard the ships because it does not want the apprentices to have the *advantages flowing* from the work they do, regardless of whether that work can be performed by SIU A & G's members or MEBA's members. The gravamen of its concern for its membership is not to obtain any par-

798

ticular assignment of work for it, but to prevent MEBA's implementation of its Apprentice Program aboard Delta's ships, because it considers that that program will detract from the incentive of its members in the engine room to become licensed engineers, and will infringe upon their opportunity to become so licensed.

This was Captain Clark's own understanding of the SIU A & G's position in the dispute. Captain Clark testified that when he pointed out to Mr. Paul Hall, the President of SIU A & G, that the Apprentice Engineer program of MEBA specifically provided that these men would not perform work which was that of unlicensed personnel, Mr. Hall pointed out that he considered wipers and other unlicensed personnel in the engine room all to be Apprentice Engineers with on the job training who could become licensed engineers through self education, and that "under no circumstances would they permit the Apprentice Engineer program to thwart the ambitions of the members of the SIU."

The answer therefore to the question which the Board insisted was the only one before this Court, that is, *was it reasonable for the Board to believe that the Union was striking for assignment of work*, must be in the negative. It was not striking for assignment of work but in protest against the implementation of MEBA's Apprentice Program aboard Delta's ships by assignment of unlicensed personnel, Apprentice Engineers, when it had an exclusive bargaining agreement with Delta for the furnishing of unlicensed personnel.[7]

The necessity for this injunction has been urged upon the Court by the Board and Delta because of the demands of

public interest and the economic distress of Delta resulting from the strike. These considerations would understandably serve to cause the injunction prayed for to issue for reasons of equity if the case were one within the meaning of Section 10($l$) of the Act, but the Section is clear that that injunction will issue only if the Board had reasonable cause to believe that a charge of unfair labor practice is true. When the Board has presented such an inadequate case that its own evidence negatives its contention that it had reasonable cause to believe that the Union was engaged in unfair labor practice by striking over an assignment of work, the Court simply does not have jurisdiction to grant an injunction under Section 10($l$).

The petition for injunction will be denied.[8]

7. This view is in accord with the view of the United States Supreme Court implicit in N.L.R.B. v. Radio and Television Broadcast Engineers Union, Local 1212, International Brotherhood of Electrical Workers, AFL-CIO, 364 U.S. 573, 81 S. Ct. 330, 5 L.Ed.2d 302 (1961), that the dispute contemplated in Section 8(b) (4) (D) is one involving which labor union is entitled to perform a *particular task*.

8. SIU NA contends that there is no possibility of a finding of reasonable cause to believe that it violated Section 8(b) (4) (D) of the Act because it has no contractual relationship with Delta, maintains no office in the district and engages in no business in the district. My decision to deny the injunction on other grounds makes a determination of this issue unnecessary.